## STATE OF CONNECTICUT *v.* MANUEL CEBALLOS
## (SC 16901)

Borden, Norcott, Palmer, Zarella and Pellegrino, Js.

Argued March 12—officially released October 21, 2003

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael Pepper*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the defendant's federal due process right to a fair trial was violated as a result of numerous instances of prosecutorial misconduct during closing arguments and in the questioning of witnesses. The defendant, Manuel Ceballos, appeals[1] from the judgment of conviction, rendered after a jury trial before the court, *Devlin, J.*, of one count each of the crimes of sexual assault in the first degree in violation of General Statutes (Rev. to 1999) § 53a-70 (a) (2),[2] and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] General Statutes (Rev. to 1999) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

(a) (2).[3] On appeal, the defendant claims that: (1) the state's attorney violated the defendant's federal and state due process rights[4] to a fair trial as a result of numerous instances of misconduct in his closing arguments and in the questioning of witnesses, including the defendant; (2) the trial court improperly admitted constancy of accusation evidence; (3) the trial court improperly failed to instruct the jury that its verdict was required to be unanimous with respect to an underlying act that would support a conviction on each of the two counts charged; and (4) the trial court improperly failed to give the jury the child credibility instruction requested by the defendant. We conclude that prosecutorial misconduct during the questioning of witnesses and closing arguments deprived the defendant of his federal due process right to a fair trial,[5] and we reverse the judgment of conviction and remand the case to the trial court for a new trial. We also will address the

[3] General Statutes (Rev. to 1999) § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

[4] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The defendant also claims that his state due process right; Conn. Const., art. I, § 8; to a fair trial was violated by the misconduct of the state's attorney. "Although the defendant also claims a violation under the state due process clause, our decision is confined to the federal constitution because the defendant has failed to provide an independent analysis of the state constitutional issue." *State* v. *Smith*, 255 Conn. 830, 835 n.12, 769 A.2d 698 (2001).

[5] Accordingly, we need not reach the defendant's alternate request that we exercise our supervisory powers to reverse his conviction "to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likelihood of conviction even though that conduct does not necessarily require reversal as a due process violation." *State* v. *Payne*, 260 Conn. 446, 451–52, 797 A.2d 1088 (2002).

defendant's claims of instructional error because they are likely to arise again at the defendant's new trial.[6]

The record reveals that the jury reasonably could have found the following facts. The defendant had resided in the New Haven home of his cousin, T, and her husband, since June, 1996. The victim, S,[7] and her mother, K, were T's granddaughter and daughter, respectively. In May, 2000, S and K resided in T's home, along with the defendant, T's husband, T's three other adult children and six of T's grandchildren, including S and her three younger brothers. K and her children, including S, lived in a bedroom on the third floor of the house. The defendant also had lived on the third floor, as did A, the uncle of S, and his infant son. The defendant did not share his bedroom with anyone else.

In May, 2000, S was seven years old. She testified that, on May 9, 2000, she was in her room with her younger brothers watching cartoons on television.[8] No one else was on the third floor of the house at that time.[9] S testified that the two boys were fighting; one brother had gone to the defendant's room and told him that the other boy was hitting him. S testified that the defendant had then entered the room and told the children to stop fighting. He then told S to come with him to his bedroom. She testified that, while she was in the defendant's bedroom with him, he kissed her, touched her chest with his hand, and partially inserted his "point-

---

[6] We need not, however, reach the defendant's constancy of accusation claims.

[7] In accordance with General Statutes § 54-86e, and the court policy of protecting the privacy of victims in sexual abuse matters, we decline to use the names of individuals involved in this appeal.

[8] S testified that she could not remember if this had occurred after school.

[9] K did testify that, although she ordinarily would not leave the children alone, she occasionally had left the younger children in the care of S when she had to go to a nearby store, or to the kitchen located on the first floor of the house in order to cook the family's meals. Indeed, we note that S testified that the May 9 incident had occurred while K had gone to the store.

ing finger" into her vagina and rectum. S testified that she did not say anything to the defendant at that time because she was "too afraid." The defendant then told her to keep what had transpired "a secret" and not to tell her mother.

S testified that the defendant had touched her in a similar manner on several occasions before May 9, 2000, and that these incidents always had occurred on the third floor of the house. She testified that she could not recall the specific dates, but that all of the incidents had occurred in April and May, 2000.[10]

S testified that on May 10, 2000, the day after one of the alleged incidents with the defendant, she had suffered from pain in the "private part" that was "[b]etween [her] legs." S told K about her pain during the early evening of that day. At that time K also had observed S scratching and "pulling on" her vaginal area. K examined the area and instructed S to put diaper rash cream on it to relieve the irritation. K then asked S whether anyone had touched her in that area.[11] K testified that S did not respond at first, and that she had seemed puzzled. K then testified that she repeated the question. At this point, S told K that the defendant had sexually abused her.

Subsequently, on the evening of May 10, K brought S to the Fair Haven Clinic (clinic) for medical evaluation. At the clinic, Laurel Shader, a pediatrician, had conducted a physical examination of S, including her vaginal and rectal areas, and also interviewed her.[12]

---

[10] We note that K had been hospitalized for a surgical procedure for three days in April, 2000.

[11] K frequently had asked S, on many different occasions, whether she had been touched inappropriately. S testified that K had asked her "[l]ike a thousand times" in the past whether anyone had touched her.

[12] K had called ahead to Ruth McGraw, S's regular pediatrician, at the clinic before bringing her there. McGraw was unable to be present for the examination and treatment of S. Accordingly, McGraw briefed Shader, who covered for her, on this matter.

Shader testified that her examination of the vaginal area revealed normal anatomy, with the exception of a scratch, or a "faint abrasion," on the outer labia. She testified that the scratch could have been caused by digital penetration by an adult's finger, but also could have numerous other causes, including the child's own scratching,[13] or the fact that "some kids at this age tend to wipe themselves too vigorously and sometimes cause little scratches . . . ." Shader also testified that slight penile penetration of the child's vagina would not necessarily cause physical trauma or leave evidence.[14] Shader indicated that the results of the rectal examination were normal; that, however, did not necessarily mean that the area had not been digitally penetrated. Finally, she testified that in the majority of sexual abuse cases, there is no physical evidence because of the delay in reporting the incident, especially when coupled with children's rapid physical healing.[15] Accordingly, a normal physical examination did not foreclose the possibility that a sexual assault had occurred.[16]

---

[13] Shader noted on cross-examination that S had been treated in February, 2000, for vaginal discharge and "contact dermatitis," or skin irritation, on the outer labia. Shader testified that this irritation would cause a child to itch or scratch at the area. A, who is S's uncle and lived in the house with K and her children, testified that, to his knowledge, K only bathed her children approximately once every four days, and that he had made comments to K about this practice.

[14] Indeed, Shader testified that examination of S's hymen revealed no abnormalities. She testified that the tissue could be moved in for as much as one centimeter without tearing. Shader testified that this flexibility allowed S to feel like she had been penetrated, while at the same time explaining the lack of physical evidence of penetration.

[15] Shader also noted that she would not expect to, and did not find, any physical evidence of the alleged kissing or chest touching.

[16] After she physically examined S, Shader had interviewed her using anatomically correct dolls of a man and a girl. Shader stated that S demonstrated the man doll's hand entering the clothing of the girl doll and touching the girl doll's genital area. This interview took place outside the presence of K, which Shader explained is the preferred practice because children often will be more forthcoming when their parents are not present.

Later on the evening of May 10, Jeff Hoffman, a New Haven police officer, responded to the clinic to conduct a preliminary investigation, and he spoke to K, S and Shader. Hoffman was met shortly thereafter by Edwin Rodriguez, a New Haven police detective. K told the police officers where they could find the defendant.[17] K subsequently brought S to police headquarters to be interviewed by Rodriguez and another detective, Patricia Adger. During this interview, S told the detectives that the defendant had sexually assaulted her. She then indicated the areas where she alleged the defendant had touched her by circling the chest, genitals and buttocks on a picture of a girl given to her by the detectives. S testified that she was tired during this interview because it was late and past her bedtime. Rodriguez testified that the interview was performed at approximately 10 or 11 p.m.[18]

Thereafter, on May 12, S and K discussed the incident again. S testified that she had told K that the defendant had put her hand onto his genitals, and had slightly penetrated her vagina with his penis.[19] S testified that the defendant always had kept his clothes on during these encounters; the defendant would unzip his pants in order to expose his genitals. S testified that she did not talk about this on May 10 with K, Shader or the police because she was "too afraid."[20] On the basis of

[17] Subsequently, the police, including Rodriguez and Hoffman, arrested the defendant in his room at the house.

[18] On cross-examination, Rodriguez testified that he was the lead investigator on the case. He testified that photographs were not taken of the defendant's bedroom and that he never asked S about the furnishings in or other descriptions of the room. Rodriguez also testified that they did not take a formal statement from K, and that when police subsequently went to the house to speak with her, she refused to talk to them. The police also did not take statements from any of the other relatives who lived in the house, including K's brother, who also had a bedroom on the third floor.

[19] K testified that, on this date, S provided information to her about the alleged sexual assaults that was different from what she was told on May 10.

[20] During cross-examination, defense counsel questioned Shader, the pediatrician who had examined S on May 10, about these subsequent disclosures.

this information, K had called the clinic and scheduled another appointment for S for May 15.

Subsequently, on May 15, Ruth McGraw, S's regular pediatrician, examined and interviewed her at the clinic. In light of S's additional disclosures, McGraw, with the assistance of Sandra Flatow, a sexual abuse expert, examined S, including her vaginal and rectal areas, and did not note any physical abnormalities. McGraw also took cultures from the vagina, rectum and throat to check for gonorrhea and chlamydia. These cultures returned negative after a laboratory analysis. Like Shader, McGraw also testified that her negative findings did not mean that S had not been sexually abused.[21]

The defendant, T and A, K's half-brother, testified for the defense. T testified that when she came home from work on May 10, 2000, K told her that the defendant had sexually abused S. She testified that she only had spoken with K about S's allegations,[22] but that she did not believe them. T testified that she never questioned S about the allegations; she had returned to work when K took S to the clinic. T, however, stated on cross-examination that she and the defendant often were not home together at the same time. She routinely had

Shader subsequently testified on redirect examination about delayed disclosure syndrome, a condition that causes younger children, out of concern about adults' responses, to "test the waters" by giving limited information about their abuse initially, and then providing more information over time. She stated that it was "not unusual" for child victims of sexual abuse to present this syndrome. Shader did testify, however, that she never had diagnosed S as suffering from this syndrome.

[21] Specifically, McGraw noted: "It's common in sexual abuse cases to have no findings. . . . It's possible to do a lot of digital or even touching private to private without there being any evidence. If evidence being notching of the hymen or disruption—or—some kind of very large hymenal orifice or something, thinning of the rim, that kind of thing, comes with usually tremendous amount of force, and that doesn't have to take place for there to be sexual abuse."

[22] On cross-examination, T stated that she did not discuss the specific allegations of abuse with K.

returned from work at 8 p.m. and the defendant routinely had departed for work shortly before 10 p.m. on weeknights.

A, who in addition to being K's half-brother, is a cousin and friend of the defendant. A testified that in May, 2000, he lived in the bedroom that was located between K's room and the defendant's room. At that time, he had worked on varying days between 8:30 a.m. to 6 p.m. as a senior citizens' driver. A testified that, to his knowledge, the defendant usually worked approximately from 10 p.m. until 7 a.m. When the defendant was in his room, A testified that the door was always closed. A testified that he was present in the house on the day and evening of May 9, 2000, but that he had gone to church for part of the evening. He also testified that the police did not question him about whether he was present in the house at the time of the alleged incident. A testified that he never had seen S go into the defendant's room.

The defendant also testified in his own defense. He described the interior of his room as containing a bed, three bureaus, family photographs and a television. He testified that the room had one window and a solid white door with a lock. The defendant testified that in May, 2000, he usually worked on Monday through Friday from 10 p.m. until 7:30 a.m. stocking at a discount store. He also testified that on May 10, 2000, he fell asleep after coming home from work and watching television, and awoke to the early evening confrontation with K at approximately 6 p.m. He testified that K was swearing at him and threatening him. He had told K to bring S in and ask her for the truth. S subsequently entered the room and accused the defendant of abuse, and he told her to "stop lying." The defendant told K to take S to the doctor and come back after an examination. Subsequently, S and K left the room, and the defen-

dant then went back to sleep. Thereafter, he awoke again and was arrested by the police.

The defendant denied ever kissing S or touching any part of her body. He also denied that she had ever touched his penis. He testified that he did not know why S had made the allegations against him. The defendant also denied that S had ever been in his room, or that he had been in her room.[23]

Subsequently, the jury convicted the defendant of one count each of the crimes of sexual assault in the first degree in violation of § 53a-70 (a) (2), and risk of injury to a child in violation of § 53-21 (a) (2). The trial court sentenced the defendant to ten years imprisonment for sexual assault, and five years imprisonment for risk of injury to a child, to be served concurrently for a total term of ten years imprisonment. This appeal followed.

I

PROSECUTORIAL MISCONDUCT CLAIMS

The defendant's first claim on appeal is that deliberate and pervasive prosecutorial misconduct deprived him of his federal due process right to a fair trial. Specifically, the defendant claims that the state's attorney committed misconduct when he: (1) asked the defendant to comment on S's veracity during cross-examination and used that line of questioning during his summation; (2) made a religiously charged statement during closing arguments; (3) injected extraneous matters into the case and appealed to the jurors' emotions and sympathies for S during closing arguments; (4) bolstered S's credibility by asking her on direct examination whether

---

[23] On cross-examination, the defendant denied that he was ever asked to watch S or her brothers. He also stated that he only spoke to S at family gatherings such as birthdays or Christmas, despite the fact that they had lived in such close proximity within the house.

her testimony was the truth; (5) argued facts not in evidence in a deliberate attempt to influence the jurors against the defendant; and (6) violated the trial court's orders on three different occasions during the trial.

We note that the defendant's claims of prosecutorial misconduct in the present case are similar to those that we recently addressed in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), because, as in that case, the defendant here contends that the cumulative effect of all the state's attorney's improprieties during questioning and closing arguments sufficiently had infected the proceedings, and thereby rendered the conviction a denial of due process. Accordingly, pursuant to *Singh*, we will "address each [claim] in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial." Id., 702.

Moreover, this case's similarity to *Singh* does not end with the nature of the misconduct alleged. Just as in *State* v. *Singh*, supra, 259 Conn. 699, the defendant in the present case did not raise at trial all of his complaints of prosecutorial misconduct. He only objected to two of the misconduct claims that arose from the state's attorney's closing argument.[24] Accordingly, the defendant "may prevail only if he satisfies all four requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)."[25] *State* v. *Singh*, supra, 699. We

[24] Specifically, the defendant objected to the portions of the closing argument wherein the state's attorney: (1) indicated that S suffered from delayed disclosure syndrome, a fact not in evidence; and (2) referred to the defendant as a "liar." In response to these objections, the trial court gave curative instructions to the jury.

[25] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to

conclude that the defendant has satisfied all four prongs of *Golding*.

Prior to analyzing the defendant's specific claims of prosecutorial misconduct, we set forth the well established principles that guide our inquiry as to all of his claims. "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . .

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Citations omitted; internal quotation marks omitted.) Id., 699–700.

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great

demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Citations omitted; internal quotation marks omitted.) Id., 701.

## A

### Whether the State's Attorney Improperly Questioned the Defendant about the Veracity of S

The defendant's first claim of misconduct is that, during cross-examination, the state's attorney improperly had asked him, in violation of our recent decision in *State* v. *Singh*, supra, 259 Conn. 712, whether S was lying, and why she would make up allegations of sexual abuse.[26] The defendant also contends that the state's

---

[26] We set forth the following exchange between the state's attorney and the defendant that occurred during cross-examination. We have italicized those questions, and their accompanying answers, which we conclude were improper.

"Q. Now, you testified before lunch . . . that you had heard [S] testify in here last Friday as to what you had done to her, right?

"A. Yes, sir.

"Q. And [defense counsel] asked had you ever kissed [S]; right?

"A. Yes, sir.

"Q. And she testified to that; right?

"A. Yes, sir.

"Q. And you said, no, you'd never kissed [S]?

"A. Yes, sir.

"Q. Never kissed her on her mouth.

"A. No.

"Q. *Never touched her body?*

"A. *No.*

"Q. *So, [S] must have been very angry at you for something to come in here and say that she had been kissed by you?*

"A. *I don't know.*

"Q. *You don't know? You heard [S] testify that you had touched her on*

attorney violated *Singh* when he used the answers from

her chest with your hand?

"A. Yes.

"Q. And you're claiming now that you never did that; right?

"A. Yes.

"Q. So, you must've done something mean to the child to make her come in here and testify that you did that to her?

"A. No.

"Q. Never did anything mean to the child?

"A. No.

"Q. Well, you heard [S] last Friday testify that you put your finger in that little girl's vagina. Do you remember hearing that?

"A. Yes.

"Q. And you're claiming that just never happened?

"A. Yes.

"Q. So, [S], in order to come in here and say that, must have something against you personally?

"A. I don't know.

"Q. You don't know if she has anything against you?

"A. I don't know, sir.

"Q. Did you ever get mad at the child?

"A. I never ha[d] a relationship with her.

"Q. Well, you heard her last Friday come in here and testify that you had put your finger into her rectum. Remember her testifying to that?

"A. Yes, sir.

"Q. And you're claiming that didn't happen either?

"A. Yes, sir.

"Q. Now, the child, again, must have something against you to come in here and tell these strangers that?

"A. I don't know, sir.

"Q. Well, why would that child come in here and testify to that?

"A. I don't know.

"Q. Did you ever have any disagreement with the child?

"A. No.

"Q. Ever reprimand the child?

"A. No.

"Q. Ever hit the child?

"A. No.

"Q. Ever tell her she was making too much noise up on the third floor?

"A. No.

"Q. Ever reprimand her brothers?

"A. No.

"Q. Never told the brothers they were making—

"A. No.

"Q. —too much noise? Never told the brothers they were fighting?

"A. No, sir.

that improper cross-examination in his rebuttal argument to the jury during summations.[27] The state concedes that the questions at issue about whether S was

"Q. Did she ever ask you for something and you didn't give it to her?

"A. No.

"Q. So, that little girl had no reason to be angry at you?

"A. I don't know.

"Q. Well, do you know of any reason why she'd be angry at you?

"A. I don't know.

"Q. So, she came in here and told us that you had touched your private to her private and she's got nothing against you?

"A. I don't know, sir.

"Q. *But that was a lie on her part, right?*

"A. *I don't know.*

"Q. *You don't know if that was a lie on her part?*

"A. *I don't know.*

"Q. *You don't know whether or not when she said you touched her private with your private that was a lie?*

"A. *No. I don't know about that.*

"Q. So, when she said that you touched your private to her private, that could've happened?

"A. No.

"Q. When she told us that she had—that you had had her touch your private with her hand she was just making that up?

"A. I don't know, sir.

"Q. You don't know where that came from?

"A. I don't know.

"Q. You can't give us any reason why [S] would come in here on Friday and testify as [to] the things she told us about you doing to her body?

"A. I don't have [any] idea.

"Q. Never mean to her?

"A. No.

"Q. Mean to the other kids?

"A. No.

"Q. Mean to her mother?

"A. No.

"Q. You never were in that room; right? Their room?

"A. No.

"Q. And [S] never once ever stepped inside your room?

"A. No.

"Q. That just never happened; right?

"A. Yes." (Emphasis added.)

[27] During closing arguments, the state's attorney stated: "Now, I also asked the defendant why would [S] come in here and say that you kissed her if it wasn't true. I don't know. I have no idea. Why would [S] say you touched her chest, put your finger in her vagina, put your finger in her rectum, touched her privates, touched her privates with your privates, put her hand on your privates? I don't know. I don't know. I don't know. Has no idea. Doesn't it make you—Doesn't it take you back here and you just want to scratch your head, because I gave him every reason in the book. I said,

lying were legally erroneous under the rule we articulated in *Singh.* The state, however, contends that these questions did not constitute prosecutorial misconduct because they did not amount to either deliberate or "seriously egregious" conduct by the state's attorney. We conclude that the line of questioning about whether S was lying, and its use by the state's attorney in closing argument, constituted misconduct.

In *State* v. *Singh,* supra, 259 Conn. 706, we addressed, as an issue of first impression in Connecticut, the "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity." We adopted this rule, noting that: (1) "questions that ask a defendant to comment on another witness' veracity invade the province of the jury," which includes the determination of witness credibility; id., 707; and (2) "questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied."[28] Id., 708. Moreover, we expressly rejected the minority rule, which "provides an exception to the prohibition of questions and comments on witnesses' veracity when the defendant's testimony is the opposite of or contradicts the testimony of other witnesses, thereby presenting a basic issue of credibility . . . [that *cannot*] be attributed to defects or mistakes in a prior witness' perception or

---

there must've been a time when you were mean to the kid, mean to mom. Did you hit the kid? Did you deprive the kid of something, didn't give her some food? Did you—Did you hit the mom, mean to the brothers? You know, he couldn't give us a reason. *He couldn't give us a reason why that kid would lie, and why is that? Because there isn't one; that's why. You know, I guess he wants you to believe that pure evil, Satan's daughter, appeared here on Friday morning in this courtroom; that the child just one . . . day decided to tell her mother, some police officers, some doctors, and eight strangers in a courtroom one big fat lie, and for what?* What has that kid gained; the acceptance of her mother?" (Emphasis added.)

[28] Indeed, we noted that "courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied." *State* v. *Singh,* supra, 259 Conn. 709.

inaccuracy of memory, rather than to lying." (Emphasis in original; internal quotation marks omitted.) Id., 710.

The record reveals that the state's attorney questioned the defendant repeatedly about whether S was lying, and about any possible motives that she might have for making her allegations of sexual abuse. See footnote 26 of this opinion. Moreover, the state made use of this cross-examination in its closing argument. See footnote 27 of this opinion. We conclude, as the state conceded in its brief, that the state's attorney's actions with respect to asking the defendant whether S was lying violated the rule articulated in *Singh* and, therefore, were improper. We also conclude, however, that the state's attorney's questions and subsequent arguments about S's possible motives for the allegations of sexual abuse were not improper. See, e.g., *State* v. *Burton*, 258 Conn. 153, 170, 778 A.2d 955 (2001) ("the state may properly argue that the witnesses had no apparent motive to lie").

Relying on this court's decisions in *State* v. *Couture*, 194 Conn. 530, 562–64, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985), and *State* v. *Hafner*, 168 Conn. 230, 246–54, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975), the state claims that the violation of *Singh* by the state's attorney does not constitute prosecutorial misconduct because it was neither deliberately undertaken in bad faith, nor seriously egregious. We disagree. The state's argument fails to acknowledge that "[t]he standard that we follow in analyzing constitutional due process claims that allege prosecutorial misconduct is the fairness of the trial rather than the culpability of the prosecutor's conduct."[29] *State* v. *Whipper*, 258 Conn.

[29] Moreover, the two step analytical process that this court undertakes in evaluating prosecutorial misconduct claims reflects this distinction. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct,

229, 262, 780 A.2d 53 (2001); see also *State* v. *Singh*, supra, 259 Conn. 723; *State* v. *Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987). Thus, the lack of bad faith on the part of the state's attorney in his questions and arguments that violated *Singh* is irrelevant to the determination of whether they were improper. Accordingly, we conclude that the state's questioning of the defendant about the veracity of S, and the comments during summation reflecting that line of questioning, were improper.

## B

### Whether the State's Attorney Made a Religiously Charged Statement during Summations

The defendant also contends that the state's attorney made an improper religiously charged statement in his rebuttal argument during summations. Specifically, the defendant contends that the state's attorney, after referencing S's statement that she believed "God will punish" people who tell lies; see footnote 40 of this opinion; improperly argued that: "I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday."[30] The state claims that the

regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial, an inquiry that in the present case necessarily will require evaluation of the defendant's other misconduct claims. See, e.g., *State* v. *Whipper*, supra, 258 Conn. 267; *State* v. *Williams*, supra, 204 Conn. 540; see also part I G of this opinion.

[30] The state's attorney had argued during summation as follows: "I asked [S] what—what happens when you tell a lie? I just didn't ask her about, you know, the color of my suit was or the shirt or whatever it was, I asked what happens when you tell a lie? The clerk just told you something. *Now, what's going to happen if you tell a lie? God punishes you. Well, I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday.* I rarely saw the kid, only at Christmas parties. Ask yourselves, before you come out of

defendant misconstrues the nature and effect of that comment, contending that it was intended to "contrast [S], who, seemingly due to her youth, believed God would punish her if she lied, with the defendant, who likely was more concerned about the jury's immediate verdict." The state also contends that this was not an improper religiously charged argument because it did not ask the jury to disregard the court's instructions in favor of a " 'higher law.' " We conclude that the state's attorney's comments were improper and constitute prosecutorial misconduct, especially when viewed within the context of the state's attorney's prior comment regarding S's credibility, namely, that the defendant wanted the jury "to believe that pure evil, Satan's daughter, appeared here on Friday morning in this courtroom . . . ." See footnote 27 of this opinion.

As an initial matter, we are mindful of the fact that the statements made by the state's attorney during his summation not only directly invoke religious characters, including "God" and "Satan," but also impliedly reference notions of divine punishment for worldly transgressions. The extent to which prosecutors may employ religious references during argument presents an issue of first impression for this court.[31] Many other

that deliberating room, who's got the greatest interest in this case to deceive you? Who's got a motive not to tell the truth here? I submit it's the defendant who's got the greatest interest here to lie to you.

"Judge Devlin will tell you that you can take into consideration the defendant's interest in this case when you're thinking about his credibility. On the other hand, if [S] has fabricated this, lied, manipulated you, before you come out of that deliberating room, you've got to ask yourselves what, for what? What has she gotten out of this? The opportunity to come in here and be vilified? The opportunity to tell you what happened to the intimate parts of her body? Some opportunity, huh? The opportunity to be examined by some doctors? The opportunity to meet with Detective Rodriguez until late at night telling him what happened? That's an opportunity I'd really like to live through." (Emphasis added.)

[31] We note that the defendant relies on the Appellate Court's recent decision in *State* v. *Thompson*, 69 Conn. App. 299, 797 A.2d 539 (2002), in support of his claim. In *Thompson*, the Appellate Court concluded that "[t]he prosecutor's statements in this case exceeded all bounds of acceptable

jurisdictions, however, both federal and state, have addressed this issue. In addition, our analysis is guided by an independent review of the substantial amount of academic commentary on the use of religious references by prosecutors. Our review of these authorities indicates that the courts overwhelmingly have taken a disapproving approach to the prosecutorial use of religious imagery and references during trials.[32] See *Bennett* v. *Angelone*, 92 F.3d 1336, 1346 (4th Cir.)

conduct by indicating that witnesses *'have reserved a place in hell for themselves.'*" (Emphasis added.) Id., 307. The court reviewed federal and sister state case law addressing the issue and stated that "[i]t is highly improper in a jury trial for a prosecutor to express an opinion suggesting to those jurors who believe in heaven and hell as an article of their religious faith that witnesses' trial testimony should result in the witnesses going to a place of eternal damnation after their own deaths. *Regardless of whether the appeal to religious imagery was meant literally, in our pluralistic society there is no place for such religious appeals in a criminal trial.* The case must be decided by the evidence or lack of it." (Emphasis added.) Id., 308.

Thereafter, we granted the state's petition for certification for appeal from the Appellate Court's decision in *State* v. *Thompson*, supra, 69 Conn. App. 299, limited to the following issues: "1. Did the Appellate Court properly conclude that the prosecutor's three improper remarks in rebuttal argument required reversal of the judgment of conviction?" and "2. Did the Appellate Court properly conclude that: (a) the trial court improperly permitted one witness to testify as to the credibility of another; and (b) that ruling constituted harmful error?" *State* v. *Thompson*, 260 Conn. 936, 802 A.2d 90 (2002). Although we endorse generally herein the legal principle articulated by the Appellate Court in its approach to the use of religious references during argument, this opinion shall not be construed as any comment on the specific merits of the *Thompson* case, which is pending before this court.

[32] Our review of the authorities indicates that the majority of the case law on this issue has developed within the context of prosecutorial religious references made during the sentencing phases of death penalty trials. These holdings, however, certainly are not inapplicable in a trial for the purpose of determining the defendant's guilt, especially when the state's case is not particularly strong. See *United States* v. *Giry*, 818 F.2d 120, 133–34 (1st Cir.) (noncapital case), cert. denied, 484 U.S. 855, 108 S. Ct. 162, 98 L. Ed. 2d 116 (1987); cf. *Sandoval* v. *Calderon*, 241 F.3d 765, 776, 779 (9th Cir.) (noting that prosecutor's religious argument during penalty phase of capital trial was "improper and highly prejudicial," especially because "[t]his is not a case where the evidence overwhelmingly supported the jury's verdict . . . [the] issue was life or death and the jury was sharply divided"), cert. denied, 534 U.S. 847, 122 S. Ct. 112, 151 L. Ed. 2d 69, cert. denied, 534 U.S. 943, 122 S. Ct. 322, 151 L. Ed. 2d 241 (2001).

("[f]ederal and state courts have universally condemned . . . religiously charged arguments as confusing, unnecessary, and inflammatory"), cert. denied, 519 U.S. 1002, 117 S. Ct. 503, 136 L. Ed. 2d 395 (1996). In a majority of these jurisdictions, the courts have concluded that prosecutorial use of religious references is always improper. These courts, however, do not concomitantly conclude that all improper religious remarks constitute harmful or reversible error. Rather, the majority approach follows the initial determination of impropriety with a subsequent analysis as to whether the defendant was prejudiced by the inappropriate remarks. See, e.g., *Sandoval* v. *Calderon*, 241 F.3d 765, 775–79 (9th Cir.) (prosecutor's argument during penalty phase of capital trial "paraphrased Romans 13:1-5, a passage from the Bible's New Testament commonly understood as providing justification for the imposition of the death penalty"; held both "improper and highly prejudicial" because "delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process" and "[t]his is not a case where the evidence overwhelmingly supported the jury's verdict . . . [the] issue was life or death and the jury was sharply divided"), cert. denied, 534 U.S. 847, 122 S. Ct. 112, 151 L. Ed. 2d 69, cert. denied, 534 U.S. 943, 122 S. Ct. 322, 151 L. Ed. 2d 241 (2001); *Coe* v. *Bell*, 161 F.3d 320, 351 (6th Cir. 1998) ("although we find [the prosecutor's statements on the Bible's support of capital punishment] inappropriate, we cannot conclude that they so tainted the proceeding that they constitute reversible error"); *United States* v. *Giry*, 818 F.2d 120, 133–34 (1st Cir.) ("no question" that prosecutor's comparison of defendant's denial of intent to import cocaine to Peter's denial of Christ was improper as "irrelevant and inflammatory appeal to the jurors' private, religious beliefs"; no surviving prejudice from misconduct, however, because of "unambiguous

evidence" and "strong and explicit" curative instructions), cert. denied, 484 U.S. 855, 108 S. Ct. 162, 98 L. Ed. 2d 116 (1987); *Hooks* v. *State*, 416 A.2d 189, 204–207 (Del. 1980) (prosecutor's characterization of defendants as " 'despicable' people to whom the Bible 'doesn't mean anything' " was improper "as appealing to the jurors' passions and prejudices" yet not prejudicial to defendants because of length of trial, great weight of evidence against defendants and · curative instruction by trial court); *State* v. *Cribbs*, 967 S.W.2d 773, 783–84 (Tenn. 1998) ("references to biblical passages or religious law during the course of a criminal trial are inappropriate"; concluding, however, that defendant was not prejudiced by prosecutor's use of " '[w]hatever a person sows, so shall he reap' " during penalty phase of capital trial because prosecutor had intended, and explained to jury, that phrase to be metaphor for individual accountability).[33]

In contrast to the majority approach, other jurisdictions permit, but do not encourage, the use of religious references as an oratorical device. See *State* v. *Williams*, 350 N.C. 1, 26–27, 510 S.E.2d 626 (prosecutor's discussion of biblical passages supporting imposition of death penalty not "grossly improper," but "discour-

---

[33] See also *Bennett* v. *Angelone*, supra, 92 F.3d 1345–47 (religious references to Noah's " 'sword of justice' " and Jesus and Romans "highly improper and deserve strong condemnation," but did not render sentencing hearing "fundamentally unfair" because of curative instruction, "vile" nature of underlying offense and defendant's own religiously-oriented summation); *Cunningham* v. *Zant*, 928 F.2d 1006, 1019–20 (11th Cir. 1991) (prosecutor's comparison of defendant to Judas Iscariot during penalty phase of capital trial was improper appeal to jurors' passions and prejudices; court did not reach issue of whether argument had prejudiced defendant); *Long* v. *State*, 883 P.2d 167, 177 (Okla. Crim. App. 1994) (prosecutor's penalty phase use of Biblical quotation that " '[w]hosoever shall harm one of these little ones who believeth in me, it is better that a millstone be hanged about his neck, and he be drowned in the depth of the ocean' " was "rank misconduct" but harmless because "evidence is undisputed" that defendant fatally shot and stabbed victim in order to avoid arrest and prosecution).

age[d]"; court "caution[ed] all counsel that they should base their jury arguments solely upon the secular law and the facts"), cert. denied, 528 U.S. 880, 120 S. Ct. 193, 145 L. Ed. 2d 162 (1999).[34] Such references, however, are generally prohibited when offered in direct support of the imposition of capital punishment upon a defendant. See, e.g., *Carruthers* v. *State*, 272 Ga. 306, 309–10, 528 S.E.2d 217 ("we have long declined to disapprove of passing, oratorical references to religious texts in arguments by counsel" and "[i]t is difficult to draw a precise line between religious arguments that are acceptable and those that are objectionable, but we conclude that the [prosecutor] in this case overstepped the line in directly quoting religious authority as mandating a death sentence"), cert. denied, 531 U.S. 934, 121 S. Ct. 321, 148 L. Ed. 2d 258 (2000).

Finally, we note the per se reversible error approach adopted by Pennsylvania as to reliance on religious writings by prosecutors in death penalty cases. See *Commonwealth* v. *Chambers*, 528 Pa. 558, 586, 599 A.2d 630 (1991) ("In the past we have narrowly tolerated references to the Bible and have characterized such references as on the limits of 'oratorical flair' and have cautioned that such references are a dangerous practice which we strongly discourage. . . . We now admonish all prosecutors that reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action." [Citations omitted.]), cert. denied, 504 U.S. 946, 112 S. Ct. 2290, 119 L. Ed. 2d 214 (1992). This approach subsequently has been modified. See *Commonwealth*

---

[31] Cf. *Bussard* v. *Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994) (defense attorney's failure to object to prosecutor's quote from Proverbs 28:1 was not unreasonable; that passage is "more poetic version" of inference that flight is consciousness of guilt and "prosecutor did not use the Bible to invoke the wrath of God against [the petitioner] or to suggest that the jury apply divine law as an alternative to the law of Arkansas").

v. *Cook*, 544 Pa. 361, 384, 676 A.2d 639 (1996) (religious references by prosecutor "were a fair response to the evidence presented by the defense and did not violate the per se rule of *Chambers*"); *Commonwealth* v. *Smith*, 544 Pa. 219, 241–42, 675 A.2d 1221 (1996) (concluding that rule of *Chambers* did not apply to "tangential" references to God).

We also note that the commentators, like the courts, are divided with respect to the degree and type of religious references that should be permitted during trials. Compare J. Blume & S. Johnson, "Don't Take His Eye, Don't Take His Tooth, and Don't Cast the First Stone: Limiting Religious Arguments in Capital Cases," 9 Wm. & Mary Bill Rts. J. 61, 94–97 (2000) (endorsing Pennsylvania's automatic reversal rule for prosecutorial religious references, except for those that are "single" or "in passing," and providing definition of "religious argument") with E. Brooks, note, "Thou Shalt Not Quote the Bible: Determining the Propriety of Attorney Use of Religious Philosophy and Themes in Oral Arguments," 33 Ga. L. Rev. 1113, 1174–80 (1999) (The commentator criticized the Pennsylvania per se reversible error rule and argued that "courts that evaluate whether religious arguments constitute error should be careful not to label all religious arguments as improper. Determination of propriety of religious statements should not look to the religious origins of the argument, but instead should compare religious arguments to other improper arguments to see if they rise to the same level of impropriety.").[35]

---

[35] See also G. Simson & S. Garvey, "Knockin' on Heaven's Door: Rethinking the Role of Religion in Death Penalty Cases," 86 Cornell L. Rev. 1090, 1119–20 (2001) (endorsing Pennsylvania's automatic reversal rule because "appeals to religion in closing argument almost always violate the Establishment Clause" and "a bright-line rule would save trial and appellate courts valuable time and resources and help ensure greater uniformity and evenhandedness in decisionmaking"); B. Duffy, note, "Barring Foul Blows: An Argument for a Per Se Reversible–Error Rule for Prosecutors' Use of Religious Arguments in the Sentencing Phase of Capital Cases," 50 Vand. L. Rev. 1335, 1383 (1997)

Having reviewed these persuasive authorities, we see no reason to depart, in the context of statements made by state's attorneys that reference or invoke religious characters or beliefs, from our well settled standard by which we evaluate any other prosecutorial statement that is challenged as constituting misconduct rising to the level of a due process violation. See footnote 29 of this opinion. Accordingly, in the determination as to whether prosecutorial misconduct constituting a denial of due process has occurred, argument by the prosecution that invokes or references religion or religious beliefs is to be evaluated under a two step progression. First, a threshold inquiry is to be performed as to whether the challenged statements pass the threshold of impropriety in that they are inflammatory, unduly evoke the passions or prejudices of the jurors, or improperly invade the province of the jury.[36] Once it has been established that the statements were improper and thereby constitute "misconduct" in the technical

(endorsing Pennsylvania's automatic reversal rule in sentencing phase of capital trials because "contextual factors should not outweigh the prejudicial effect of these religious arguments").

[36] We recognize that there may be instances in which prosecutorial religious references are necessary and appropriate as a "discussion of evidence presented at the trial concerning the specific religious beliefs or activities of the defendant(s) or victim(s)" when such beliefs or activities are "directly . . . relevant for the resolution of the matter at issue." J. Blume & S. Johnson, supra, 9 Wm. & Mary Bill Rts. J. 94–95.

We strongly caution counsel, however, against making unnecessary religious references during trial. As one court has stated: "Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials." State v. Williams, supra, 350 N.C. 27. Further, we are mindful that religious references during trial are fraught with possible establishment clause complications. See, e.g., G. Simson & S. Garvey, "Knockin' on Heaven's Door: Rethinking the Role of Religion in Death Penalty Cases," 86 Cornell L. Rev. 1090, 1113 (2001) ("For the endorsement test to apply there must be governmental action of some sort that may be understood as sending a message of government endorsement of religion. When the prosecutor, a governmental actor, makes religiously based closing arguments, this requirement is obviously met.").

sense, a determination shall be made as to whether the misconduct was substantially prejudicial to the defendant. "In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 699–700; see also footnote 29 of this opinion.

As to the first stage in this process, a prosecutorial statement that references religion and is alleged to constitute misconduct can be evaluated, just as any other statement made by a prosecutor, on an individual basis to determine if the statement is improper. The best approach is to view the statement of the prosecutor in the context and in the manner in which it was made; to evaluate whether the statement improperly invaded the province of the jury as to the assessment of evidence or the finding of fact; and to determine if the statement had the inflammatory impact of infusing passion, prejudice, or resentment into the minds of the jurors on a case-by-case basis. If misconduct is found as a threshold matter, then the prosecutorial statement, viewed in the collective with all other statements found to be improper, will be measured within the second stage of the analysis: whether the statements were substantially prejudicial such that the fundamental fairness of the trial was adversely impacted.

The sum and substance of our analysis into allegations of prosecutorial misconduct when religious references are made is, therefore, in harmony with the analytical construct of the majority of jurisdictions. As already noted, in those jurisdictions prosecutorial impropriety does not necessarily equate to reversible prosecutorial misconduct; rather, a further showing of actual prejudice must be made in order for prosecutorial misconduct to warrant reversal. This subsequent

demonstration of prejudice is identical to the second step of our progression: whether prejudice has been visited upon a criminal defendant as a result of established misconduct.

Turning to the statements made by the state's attorney in his summation in the present case, we conclude that the state's attorney committed prosecutorial misconduct when he remarked: "I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday." This statement, particularly in light of his further reference to "Satan's daughter," far overstepped the bounds of appropriate prosecutorial argument or permissible oratorical flair. We are persuaded that the context of the statements, the manner in which they were delivered, and the substance of the remarks constituted inappropriate statements under our well established standard regarding prosecutorial misconduct. In our view, the state's attorney's separate direct invocations of religious characters served solely as an inflammatory emotional appeal to the passions and prejudices of the jury, and bore no reasoned connection to the jury's determination as to the ultimate issue before them, namely, the defendant's guilt or innocence.[37] See, e.g., *Cunningham* v. *Zant*,

---

[37] We acknowledge the dissent's concern that "words and phrases traditionally viewed as religious in nature or derived from religious sources have become, over time, an integral part of the English language, and no longer may be recognized by either prosecutors or jurors as having purely religious connotations or derivations," and the attendant assertion that the remarks made by this state's attorney are not religious in nature. Our guidance on this issue is provided by the "abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." (Internal quotation marks omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 266, 765 A.2d 505 (2001). We fail to see how the state's attorney's use of the phrase "Satan's daughter" puts it into the category of an otherwise common phrase with religious origins, especially when it is taken in context with the immediately subsequent remarks contrasting the respective concerns of S and the defendant about *God*. Moreover, the dissent is incorrect in its claim that the use of

928 F.2d 1006, 1020 (11th Cir. 1991); *United States* v. *Giry*, supra, 818 F.2d 134; accord *State* v. *Singh*, supra, 259 Conn. 719.

Moreover, we are markedly troubled by the state's attorney's reference to the possible divine consequences that await the defendant as a result of his actions. As mentioned, the state contends that this statement was relevant to the determination of the defendant's credibility because it was intended to contrast S, who "seemingly due to her youth, believed God would punish her if she lied, with the defendant, who likely was more concerned about the jury's immediate verdict." We reject the state's assertion that this statement was not inflammatory and provided meaningful guidance to the jury as it undertook its credibility determinations. Rather, we view this statement as an indication to the trier of fact, the jury, that another trier of fact, a divine one nonetheless, awaited the defendant to punish him for his lack of veracity. By raising the inference that the defendant already had been adjudged guilty by an omnipotent other, the statement impermissibly invaded the province of the jury to pass upon the credibility of the respective witnesses. In addition, we are not convinced that this was the only inference that may have been planted in the minds of jurors; a statement referencing possible punishment by a divine being for wrongs allegedly perpetrated by the defendant, within

the word "Satan" in the religious sense is obsolete. In fact, under the same entry set forth in Webster's Third New International Dictionary as cited by the dissent, the first definition provided is a direct cross reference with the word "devil." "Devil" is defined by Webster's Third New International Dictionary as "the personal supreme spirit of evil and unrighteousness in Jewish and Christian theology: the tempter and spiritual enemy of mankind who is the adversary of God although subordinate to him and able to act only by his sufferance and is represented frequently as the leader or prince of all apostate angels and as ruler of hell . . . ." Thus, at least our scrutiny of such an authority as Webster's Third New International Dictionary reveals that the dissent's assertion that the word "Satan" has shed its religious implications is without foundation.

the context of summations in a criminal trial, also may have served to cast doubt upon the ultimate issue before the jury: the guilt or innocence of the defendant. Accordingly, we conclude that the state's attorney's remark about the defendant's concern with the jury, as opposed to God, was inflammatory, impermissibly invaded the province of the jury, and was improper.

## C

### Whether the State's Attorney Improperly Appealed to the Jury's Sympathy for S and Improperly Injected Extraneous Matters into the Trial

The defendant next claims that, during the state's attorney's initial closing argument, he had: (1) injected extraneous matters into the trial; and (2) appealed to the jury's emotions to evoke sympathy for S. Specifically, the defendant contends that the following comments during closing argument constituted an improper appeal to the jury's emotions: (1) the state's attorney's descriptions of S's difficult childhood and poor living conditions; (2) statements of how courageous S was by testifying; and (3) the statement that S "did her part last Friday. With all due respect, ladies and gentlemen, it's now time for you to do your part."[38] The state claims

---

[38] The state's attorney also had argued: "I said before that [S] was . . . a perfect victim. She's a little girl. She lives in one room with her three little brothers and her mom. You know, you heard that she cares for those three brothers; that she changes their diapers; that the seven year old is given adult responsibilities. You know, the father's out of the picture, mom doesn't spend as much time with her as she wanted. She talked to you about that, and you know, you've got poor [K]; she's got four kids; she's working full time. You know, they live, they eat, they sleep in one room, no bathroom facilities, no kitchen facilities. The only way out of that little island they've got up there on the third floor is right by his room. That's why I call her the perfect victim, his perfect victim. He could choose her, he could choose the time, he could choose the place, and he was taking a chance that it would never get this far, but I would submit, ladies and gentlemen, because she—because [S] had the courage to tell us what happened, tell us about that monstrous crime that was inflicted upon her body and her mind. Through her courage, coming in here, I hope you've developed a respect for how difficult it is to bring this kind of case to trial, how difficult it is to bring

in response that: (1) the description of S as courageous was not an improper appeal to the jurors' emotions, but rather was an argument in support of her credibility because it explained that she had nothing to gain personally by testifying about embarrassing matters to strangers in court; (2) the discussions of S's living arrangements were intended to show that the defendant had the opportunity to commit the crime; and (3) the "do your part" comment was not improper because, taken in context, it did not predict the negative future effects of an acquittal, but merely informed the jury that the matter was in their hands. We conclude that some of these comments breached well established boundaries of appropriate prosecutorial advocacy and, therefore, were improper.

We begin with the well established proposition that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719; accord *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000); *State* v. *Williams*, supra, 204 Conn. 546.

We begin by concluding that the state's attorney's comments about S being the "perfect victim" because

the [defendant] to justice. Through her courage, I submit, ladies and gentlemen, and through her courage alone, she came in here and told you how that man violated her and how [the defendant] should be brought to justice and accountability. [S], she did her part last Friday. With all due respect, ladies and gentlemen, it's now time for you to do your part."

of her difficult childhood and poor living conditions were not improper appeals to the jury's emotions. Although the state's attorney elected to make an opportunity argument in a manner that cast S in an undoubtedly sympathetic light because of her disadvantageous family situation, this did not detract from the main point of the argument, namely, that the defendant had ample opportunity to abuse S. We, therefore, agree with the state's contention that these remarks constituted a proper argument that the defendant had the opportunity to commit the crimes alleged.

We also conclude that the state's attorney's comment that "[S] did her part last Friday . . . [w]ith all due respect, ladies and gentlemen, it's now time for you to do your part," was improper. We base this conclusion on our recent decision in *State* v. *Whipper*, supra, 258 Conn. 271–72. In *Whipper*, the prosecutor had stated to the jury: " 'Now you're here as members of the community. You represent what your community is going to be. Not me. I did my part. The police did their job . . . .' " Id., 271 n.19. In *Whipper*, we concluded that this comment was "clearly . . . improper" because, in suggesting "that the jury had a duty, as members of the community, to convict the defendant . . . it asked [the] jurors to consider matters not in evidence when deliberating the defendant's guilt." Id., 271. We also concluded, however, that these remarks did not deprive the defendant of his right to a fair trial because the defendant's counsel had objected and the trial court had given an adequate curative instruction. Id., 272.

In our view, the state's attorney's comment in the present case to the jury to "do your part" was as inappropriate as the prosecutor's statement in *Whipper*. We are not persuaded by the state's contention that this argument was proper because it did not predict the negative effects of a not guilty verdict, but merely stated that the matter was now in the jury's hands for delibera-

tion. These arguments, taken in context, suggested that the mere fact that S came forward to testify obligated the members of the jury to "do your part" and convict the defendant. Indeed, we note particularly that this statement was made in the sole context of the state's attorney's discussion of S's courage. Accordingly, we conclude that this comment was improper. Moreover, we conclude similarly that the state's attorney's comments about how courageous S was by coming forward with her allegations and testifying in court also constituted an inappropriate appeal to the jurors' emotions.

## D

### Whether the State's Attorney Improperly Bolstered S's Credibility

The defendant next claims that the state's attorney improperly bolstered S's credibility by, in essence, rehabilitating her testimony before she was ever impeached. Specifically, the defendant, relying on *People* v. *Loggins*, 257 Ill. App. 3d 475, 488, 629 N.E.2d 137 (1993), claims that the state's attorney improperly had questioned S at the conclusion of direct examination about whether her testimony was truthful; this, therefore, invaded the province of the jury because she had testified as to the ultimate issue in the case, which was her truthfulness, and permitted S to "lift herself by [her] own bootstraps . . . ."[39] The state claims in response that this line of

---

[39] The defendant cites specifically this line of questioning of S by the state's attorney, which occurred at the end of direct examination:

"Q. [S]?

"A. Yes.

"Q. This is a very important question, okay?

"A. Okay.

"Q. Remember the clerk asked you to tell the truth?

"A. Yes.

"Q. Okay. Is what you've told us been the truth here?

"A. Say it again, please.

"Q. Has what you've told us here the last [forty-five] minutes or so been the truth?

"A. Yes."

questioning dovetailed with preliminary background questions in which the state's attorney sought to ascertain whether S knew the difference between the truth and a lie,[40] making it, therefore, merely confirmatory. The state also claims that this court, in *State* v. *Silveira*, 198 Conn. 454, 474, 503 A.2d 599 (1986), implicitly has rejected the defendant's contention that a witness cannot "lift herself by [her] own bootstraps" in the absence of impeachment. We conclude that the questioning by the state's attorney of S at the conclusion of direct examination, about whether her testimony was truthful was, in light of her young age, proper.

We begin our analysis of the defendant's claim by exploring the reasoning of *People* v. *Loggins*, supra, 257 Ill. App. 3d 475, the case on which he relies. In *Loggins*, the defendant claimed that certain questions by the prosecutor on redirect examination were improper attempts to rehabilitate the witness. Id., 484–88. The court concluded that most of the questions were permis-

---

[40] The state's attorney had conducted a preliminary questioning of S during direct examination. After he ascertained her age, date of birth and the school that she attends, he asked the following questions:

"Q. Now, the clerk just asked you to tell the truth here on the stand, right?

"A. Yes.

"Q. Okay. Do you know the difference between the truth and a lie?

"A. Yes.

"Q. Can you tell us what a lie is?

"A. A lie is when somebody tells somebody a secret and somebody lies— and somebody doesn't tell it.

"Q. Let me ask you this. If I told you that I was wearing a red suit right now, would that be a truth or a lie?

"A. A lie.

"Q. Okay. Why?

"A. Because you're not even wearing one.

"Q. I'm not wearing a suit?

"A. Yes, you are, but not what you said.

"Q. A red suit?

"A. A red suit.

"Q. Okay. What happens to you if you tell a lie?

"A. God will punish you."

sible, but ruled improper the question to a witness on redirect: " 'Can you take a look at them [the jury] and tell them if you told them the truth?' " Id., 488. The court stated that the question was "an improper attempt to rehabilitate the witness as to her veracity. The witness cannot lift herself by her own bootstraps." Id. The Illinois court concluded, however, that while the question improperly invaded the jury's function of determining the credibility of a witness and the weight afforded his or her testimony, the error was harmless in light of the "overwhelming" evidence against the defendant. Id.

We conclude that the reasoning of *Loggins* is inapposite in the present case, wherein the witness is a young child such as S. Although S's awareness of the difference between the truth and a lie already had been established in the preliminary examination by the state's attorney; see footnote 40 of this opinion; this brief line of confirmatory questioning at the conclusion of her testimony did not improperly bolster her credibility in the absence of attack. The state's attorney's follow-up questions were not extrinsic evidence; they merely served to confirm a young child's awareness of the significance of the oath that she had taken previously. We, therefore, conclude that the follow-up questions did not constitute improper bolstering of S's credibility.[41]

[41] We do, however, reject the state's contention that this court implicitly rejected the "bootstraps" rationale of *Loggins* in *State* v. *Silveira*, supra, 198 Conn. 476, wherein we concluded that "[t]here is no rule in this jurisdiction which prevents a witness from testifying to relevant facts within his personal knowledge merely because his testimony may be self-serving." In *Silveira*, the defendant had been charged with manslaughter in the first degree with a firearm. Id., 455. This court concluded that the trial court improperly had excluded as self-serving the defendant's testimony about his state of mind at the time that he had fired the fatal gunshot because "mental condition is a fact, and, where relevant to an issue in the case, the witness concerned may testify directly to it." Id., 476.

The evidentiary context of *State* v. *Silveira*, supra, 198 Conn. 474–76, renders it distinguishable from the present case because of the nature of the testimony at issue. In *Silveira*, the defendant sought to testify about a

## E

## Whether the State's Attorney Improperly Commented on Facts Not in Evidence

The defendant next claims that, during his initial closing argument, the state's attorney twice improperly had commented on facts that had not been admitted into evidence. Specifically, the defendant claims that the following comments were improper: (1) stating, during his discussion of the testimony of Shader, that S suffered from delayed disclosure syndrome, when Shader had in fact testified that S never had been diagnosed with this syndrome;[42] and (2) remarking that the defendant had abused S "physically, sexually, and also mentally," because no evidence had been introduced as to any emotional trauma suffered by S.[43] The state con-

*fact*, central to the case, that happened to be self-serving. Id., 475–76. In contrast, in the present case, as in *Loggins*, the state's attorney already had elicited testimony from S about the *facts* relevant to the case against the defendant. The questioning at issue, therefore, dealt solely with her credibility and the *weight* that the jury should place on her testimony, not the facts at issue. Accordingly, we conclude that *Silveira* neither informs our decision in the present case, nor constitutes a rejection of the rationale in *Loggins*.

[42] After describing the testimony of Shader about how the allegations of S were not inconsistent with a lack of injury or physical injury, the state's attorney stated: "She also told you what [S] didn't tell us and why [S] didn't give us all the details. [S] told her that what she had told her mom that day initially, the initial disclosure, the kissing, the touching of the chest, the digital penetration of the rectum and the vagina. And . . . Shader testified, as a pediatrician, they are trained, they know this, this is common in—in child sexual abuse victims. There is a syndrome that children, when they have been sexually abused as children, that they just don't blurt out every single thing that happened to them. It is—*It is a common syndrome among child sexual abuse victims and [S] is no different from that. In fact, she suffered from that.*" (Emphasis added.)

[43] The defendant specifically claims that the following comments by the state's attorney with respect to emotional trauma suffered by S were improper. The state's attorney introduced his discussion of the testimony of S by stating: "Now, ladies and gentlemen, I submit that the child was abused physically, sexually, and also mentally by that man sitting over at that table." The defendant also claims that the following comment, made in the context of the discussion about S's delayed disclosure, was improper: "Sexual assault, like any assault, is traumatic, but sexual assault on a woman—on a little girl, not only of the body but of the mind."

tends, in response, that: (1) there was sufficient evidence in the record to support an inference that S had suffered from delayed disclosure syndrome, and that Shader's testimony had been admitted in order to help the jury determine whether the delayed disclosure of S's allegations was indicative of fabrication; and (2) the principle that sexual abuse has mental, as well as physical, effects on children is obvious to the jury, and the statement to that effect therefore was not misconduct. We agree with the state, and we conclude that neither the statement about S having suffered from delayed disclosure syndrome, nor the remark about the mental effects of childhood sexual abuse, were improper.

It is well established that a "prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [T]he state may [however] properly respond to inferences raised by the defendant's closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 717.

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted.) Id., 718.

We conclude that the state's attorney's comment about S having suffered from delayed disclosure syndrome was not improper because it was an argument

in support of an inference that could be drawn from evidence in the record, namely, Shader's testimony. Our review of the record indicates that although Shader testified that S never had been diagnosed formally with delayed disclosure syndrome, the timing of S's allegations, coupled with Shader's general testimony about the occurrence of this syndrome in child victims of sexual abuse, would permit the jury reasonably to infer that S had suffered from delayed disclosure syndrome. See footnote 20 of this opinion. Accordingly, we conclude that the state's attorney's remark about S suffering from delayed disclosure syndrome was a proper argument in support of an inference that permissibly could be drawn from the evidence in the record.

Moreover, although the more artful way to phrase the argument probably would have been for the state's attorney to state that, "you can infer that S suffered from delayed disclosure syndrome," any impropriety stemming from this remark was cured by the trial court. We note that the defendant had objected to this comment. The trial court sustained the defendant's objection and instructed the jurors to disregard that portion of the state's attorney's argument that specifically related S to delayed disclosure syndrome.[44] Therefore, even if the state's attorney's comment improperly had referred to facts not in evidence, the prejudicial effect of this comment was mitigated by the trial court's curative instruction. *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001 ("a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any

[44] Specifically, the trial court stated that "there may have been a reference or there was some reference to this so-called syndrome that . . . Shader testified about concerning the way in which some victims of child abuse relate information in sort of stages. She gave testimony about that, and that was referenced in the—in the argument. Whether or not that applies to [S], there was no testimony specifically relating her to that syndrome by . . . Shader. To the extent that may have been mentioned to that extent in the argument, you should disregard that part of the argument."

possible harm to the defendant"), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *State* v. *Whipper*, supra, 258 Conn. 258 ("[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions" [internal quotation marks omitted]).

We also conclude that the state's attorney's remarks about the mental trauma alleged to have been suffered by S were proper, despite the lack of evidence in the record about the psychological effects of child sexual abuse. "In deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Rolli*, 53 Conn. App. 269, 281, 729 A.2d 245 (prosecutor's remarks about driving time on Interstate 95 from West Haven to New Haven permissible appeal to jurors' common knowledge), cert. denied, 249 Conn. 926, 733 A.2d 850 (1999); see also *State* v. *Singh*, supra, 259 Conn. 716 n.22 (remark that " 'gasoline is heavier than air' " not improper because "most people would know" that fact). In our view, it is axiomatic that child sexual abuse has mental and emotional repercussions for the victim. Thus, the state's attorney's comments about the psychological effects of the sexual acts alleged to have been committed against S were proper.

F

Whether the State's Attorney Improperly Violated the Trial Court's Orders

The defendant next claims that the state's attorney deliberately and improperly had defied the orders of the trial court when he: (1) questioned Shader about

delayed disclosure syndrome without giving defense counsel advance notice of such testimony; (2) argued during summation that S suffered from delayed disclosure syndrome, despite the trial court's order that Shader was not allowed to testify about whether S actually had the syndrome; and (3) discussed S's testimony in front of K while arguing for the admission of constancy of accusation testimony, despite the trial court's having entered a sequestration order. The state claims in response that: (1) the state's attorney did not violate a court order with respect to Shader's testimony because there was no court order but, rather, merely an agreement between the parties that the state thought had been abrogated implicitly by the defendant's cross-examination of Shader; (2) although Shader did not say that S had suffered from delayed disclosure syndrome, there was sufficient evidence introduced to permit the jury to infer that fact; and (3) the defendant failed to object to the sequestration order issue in a timely manner, and the trial court had authorized the state's attorney to put S's testimony on record in front of K. We conclude that the state's attorney neither improperly questioned Shader about delayed disclosure syndrome, nor violated the trial court's sequestration order.

Whether a prosecutor's improper conduct was a deliberate circumvention of the trial court's express rulings is significant because we apply a different standard as such misconduct involves prejudice to the entire judicial system, in addition to prejudice to the defendant. *State* v. *Whipper*, supra, 258 Conn. 269; *State* v. *Ubaldi*, supra, 190 Conn. 575. In *Ubaldi*, this court concluded that "[w]here a prosecutor in argument . . . interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribu-

nal." *State* v. *Ubaldi*, supra, 575. This is distinct from misconduct that does not involve "purposeful disregard of a ruling, which requires the defendant to prove that he was deprived of a fair trial as the result of the misconduct . . . ." Id. In contrast, a new trial ordered because of a prosecutor's deliberate violation of trial court rulings is ordered pursuant to this court's supervisory powers, rather than to remedy the violation of the defendant's due process rights. Id., 570. We emphasize, however, that this remedy is not automatic even in cases of deliberate defiance. This court will take a "cautious approach" and balance other interests and practical considerations, such as the trauma caused to the victim who must testify again, prior to ordering a new trial pursuant to its supervisory powers. Id., 572. Indeed, we will evaluate whether the violation of the trial court's ruling "was so unduly offensive to the maintenance of a sound judicial process that reversal of the defendant's conviction is necessary." *State* v. *Whipper*, supra, 269.

We first address the defendant's claim that the state's attorney had violated the court's orders by questioning Shader about delayed disclosure syndrome without first giving defense counsel advance notice of such testimony. We set forth the following additional facts and procedural history necessary for resolution of this claim. The defendant had filed a motion for disclosure of any expert opinion testimony to be proffered by the state. The court granted the motion after the state's attorney agreed to alert defense counsel, outside the presence of the jury, of any intention to introduce expert testimony about the victim's delayed reporting of child sexual abuse. During cross-examination, defense counsel questioned Shader about the allegations that S had not disclosed initially. Subsequently, the state's attorney attempted to question Shader on redirect examination about delayed disclosure in child sexual abuse cases, but did not first notify the defendant of

this line of questioning. The defendant then objected to these questions, claiming that they were beyond the scope of cross-examination, and that they violated the agreement that such questions would be asked outside the jury's presence. The trial court permitted Shader to testify, and concluded that this testimony was responsive to the cross-examination about the lack of certain disclosures. After voir dire by both parties, the trial court ruled that Shader was qualified to testify generally about delayed disclosure in child sexual abuse victims, but could not offer an opinion about S in particular. Shader then testified before the jury about delayed disclosure syndrome. See footnote 20 of this opinion.

We conclude that the state's attorney's questioning of Shader about delayed disclosure, without first notifying defense counsel, was not "so unduly offensive to the maintenance of a sound judicial process that reversal of the defendant's conviction is necessary." *State* v. *Whipper*, supra, 258 Conn. 269. Although the better practice would have been to give the requisite notice to defense counsel, we are persuaded by the state's contention that Shader's testimony was found relevant and admissible by the trial court, which led to those questions being asked in front of the jury. We also note that the state's questions occurred on redirect examination, after the defendant already had questioned Shader about the inconsistent and delayed disclosures as reflected in S's medical records. Cf. *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986) ("The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . The doctrine of opening the door cannot, of course, be subverted

into a rule for injection of prejudice." [Citations omitted; internal quotation marks omitted.]).

We next turn to the defendant's claim that the state's attorney had violated the court's express orders when he had argued that S suffered from delayed disclosure syndrome. We already have concluded in part I E of this opinion that this argument was proper because it referred to an inference that reasonably could be drawn from evidence in the record. We note, however, that the defendant objected to these comments during summations, and that the trial court sustained the objection and gave a curative instruction to the jury. See footnote 44 of this opinion. Accordingly, we conclude that, even if we were to assume that the comment was improper, its effects were mitigated by the trial court, and the comment, by itself, does not rise to the level of disobedience that requires reversal. See *State* v. *Whipper*, supra, 258 Conn. 258 (value of curative instruction); *State* v. *Ubaldi*, supra, 190 Conn. 563 (same).

Finally, we address the defendant's claim that the state's attorney violated the trial court's sequestration order when he had discussed S's testimony in front of K while arguing for the admission of constancy of accusation testimony. The defendant had filed a pretrial motion requesting the trial court, pursuant to Practice Book § 42-36, to direct the state's attorney to: (1) sequester each of its witnesses during the evidentiary portion of the jury trial; and (2) warn each of his witnesses not to discuss the contents of his or her testimony with any other witness. The trial court granted this motion applicable to the witnesses for both parties. During his direct examination of K, the state's attorney indicated that he wished to introduce constancy of accusation evidence pursuant to *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996). While K was seated on the witness stand, the state's attorney stated that he wished to put on the record the accusations

that S had testified to previously. The trial court granted this request. The state's attorney then discussed the specific accusations that S had testified that she had told K. At this point, the defendant objected to this being done in front of K. The trial court sustained the defendant's objection and excused K from the courtroom. The state's attorney then continued his recitation prior to resuming his questioning of K.[45]

In our view, the state's attorney's statements in the presence of K arguably may have contravened the spirit and purpose of the sequestration order. The defendant, however, did not object immediately, despite the fact that the state's attorney clearly had prefaced his comment with a statement of his intent to put the accusations of S on the record. Indeed, the defendant did not object until after the state's attorney already had begun his recitation. Accordingly, we conclude that the state's attorney's discussion of S's testimony in front of K did not rise to the level of deliberate flouting of a trial court order as contemplated by *State* v. *Ubaldi*, supra, 190 Conn. 575. See also *State* v. *Whipper*, supra, 258 Conn. 269.

## G

### Whether the Prosecutorial Improprieties Deprived the Defendant of His Right to a Fair Trial

Having reviewed the defendant's claims of prosecutorial improprieties, we now turn to the "ultimate ques-

[45] Specifically, the following colloquy occurred between the parties and the court:

"[State's Attorney]: . . . I don't think *Troupe* restricts me. If I can just put on the record what . . . I'd like to bring out.

"The Court: Okay. Sure.

"[State's Attorney]: As Your Honor's heard [S] testify that on May 10th she told her mother that she had been kissed, touched in the chest area, a finger had been inserted in her vagina and in her buttocks.

"[Defense Attorney]: Well, Your Honor, I object to this being done in front of the witness.

"The Court: Okay. Witness can be excused. (Whereupon the witness leaves the courtroom.)"

tion," which is "whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 723; accord *State* v. *Alexander*, supra, 254 Conn. 303. The defendant contends that, viewed in light of the factors for determining the seriousness of misconduct, as set forth in *State* v. *Williams*, supra, 204 Conn. 540, the state's attorney's improprieties in the present case amounted to a due process violation because they were: (1) uninvited by the defense; (2) pervasive throughout the trial; (3) directed at the central issue in the case, which was the credibility of S and the defendant; and (4) made in the context of a weak state's case. The state contends in response that the defendant was not prejudiced by the prosecutorial improprieties because many of the state's questions and comments were invited by defense counsel's arguments: (1) in support of the defense theory that S had fabricated her allegations, including counsel's comments on the lack of physical injury; (2) intended to generate sympathy for the defendant; and (3) expressing personal comments about the quality of the police investigation. The state also contends that: (1) curative measures taken by the court, and by the state's attorney during argument, mitigated any harm suffered as a result of these comments; and (2) the lack of conclusive physical evidence did not necessarily make the state's case against the defendant weak. We conclude that, when viewed in the context of the entire trial, the prosecutorial misconduct deprived the defendant of his due process right to a fair trial.

It is well established that "[i]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the mis-

conduct was invited by defense conduct or argument
. . . the severity of the misconduct . . . the frequency
of the misconduct . . . the centrality of the miscon-
duct to the critical issues in the case . . . the strength
of the curative measures adopted . . . and the strength
of the state's case." (Citations omitted.) Id.; accord *State*
v. *Singh*, supra, 259 Conn. 723; *State* v. *Alexander*,
supra, 254 Conn. 304.

1

## Whether the Prosecutorial Misconduct Was Invited by the Defense

Much of the state's argument focuses on the first
*Williams* factor, which is the degree to which the prose-
cutorial improprieties were invited by defense counsel.
Specifically, the state contends that the state's attor-
ney's violations of *State* v. *Singh*, supra, 259 Conn.
706–707, during questioning and argument; see part I
A of this opinion; were invited by the " 'only possible' "
defense theory that S had fabricated her claims. We
disagree with the state because we reject the notion
that, standing alone, a legitimate defense theory can be
viewed as inviting improper conduct on the part of
the state's attorney. Accordingly, we conclude that the
violation of *Singh* by the state's attorney was not invited
by the defendant or his attorney.

As for the remaining improprieties, we conclude that
the state's attorney's improper comments during sum-
mation, were not invited by the arguments of defense
counsel. Specifically, we disagree with the state's claim
that the state's attorney's comments that implored the
members of the jury to "do your part"; see part I C of this
opinion; were invited by defense counsel's depiction,
during his summation, of the defendant as a good per-
son who had emigrated to the United States in search

of a better life.[46] As the defendant correctly points out, the state's attorney made the challenged sympathy-generating comments during his initial summation, and *not* during the state's rebuttal to the defendant's closing argument.[47] Moreover, the state does not claim that the religiously charged statement during rebuttal summation was invited. See part I B of this opinion.

## 2

### Whether the Prosecutor's Misconduct Was Severe and Frequent

We next turn to the severity and frequency of the misconduct in this case. The defendant contends that

[46] The defense counsel had argued during his summation: "Now, [the defendant] didn't come to this country to be categorized as a pervert or a sex offender. He came here to better himself. He came here to further educate himself. He came here to work, and you heard that he did that. None of that was rebutted, none of that was contested. That's what he did. He listed the places that he's been. He was working at the time of his arrest. He'd been at X-Pect Discount working a night shift there for five months. He pretty much stayed to himself or went out with his friends. He came out to the witness stand and subjected himself to cross-examination. He firmly looked at you when asked a question about whether he did this. When he was asked direct questions, Did he touch the child, did he kiss [S], did he put his hands on her genital area, or in her butt? No. When he was asked whether she was ever in his room, no. Whether he was ever in their room, no. And the only time that he answers questions I don't know is in that series on cross-examination when the questions started out is why would [S] say this about you? I don't know. Well, she says this happened, is she lying? I don't know. Well you might wonder why is he saying I don't know to that? Well, he's not—You saw his character and his persona up there. He's not going to call an eight—an eight year old a liar; that's just not in his nature. You saw how he answered the questions, how he's conducted himself during the course of the trial. It's not in his nature to do that. Any time he's asked a specific direct question about this, his answers are firmly no, and that's because it never happened."

[47] In a similar vein, we note that the state claims that defense counsel committed numerous improprieties during his summation, such as making disparaging comments about the lack of evidence of physical injury, as well as the quality of the police investigation in the case, and that these improprieties invited or counterbalanced any prosecutorial misconduct. We decline to discuss these claims because the comments challenged by the defendant occurred primarily during the *initial* summation, and therefore

the misconduct was both frequent and severe because it had occurred during both cross-examination and summations. The state contends that the misconduct was not frequent and severe because most of the defendant's claims did not constitute misconduct, and what misconduct there was had been neither purposeful nor blatant. Our analysis, however, reveals that the prosecutorial improprieties that occurred in the present case were not just isolated instances. Indeed, they occurred during both the questioning of witnesses and during argument.

Moreover, we conclude that the prosecutorial misconduct present in this case was severe in nature. In particular, we note that the seriously inflammatory comments made by the state's attorney referencing religious entities and divine consequences; see part I B of this opinion; tainted the trial with fundamental unfairness. Although we decline, at this time, to adopt a per se rule that all prosecutorial references to religious beliefs or entities are improper, we are nevertheless mindful that religion, perhaps more so than any other subject, evokes intensely personal, and deeply held, feelings. Accordingly, when prosecutorial statements challenged as misconduct involve references to religion, courts are to scrutinize carefully the content, context, spirit and import of the remark, while affording due weight to the often deeply inflammatory nature of such statements. In this instance, we conclude that the remarks of the state's attorney were singularly inflammatory and prejudicial. Having determined that these statements were frequent and severe, we, therefore, must weigh them in the context of the remaining *Williams* factors: the existence of curative measures taken by the court; their relation to the case's central issue; and the strength of the state's case.

---

could not have been *invited* by any improprieties committed during summation by the defense counsel.

## 3

### Whether Sufficient Curative Measures Were Taken

We next must determine whether the effect of the prosecutorial misconduct was mitigated by curative measures taken by the trial court. The record reveals that the trial court addressed specifically the objections of defense counsel to the state's attorney's comments: (1) claiming that S suffered from delayed disclosure syndrome;[48] and (2) calling the defendant a "liar" during his rebuttal argument.[49] We also note that the trial court gave general jury instructions that: (1) admonished the jury not to consider their sympathy in determining the facts; (2) explained that evidence is limited to testimony and exhibits, the effect of limited, excluded or stricken evidence, and that the lawyers' arguments are not evidence; and (3) explained the state's burden of proof.

The defendant contends that, taken in the context of the other *Williams* factors, these general instructions

---

[48] See footnote 44 of this opinion for the trial court's curative instruction with respect to the state's attorney's delayed disclosure syndrome comments. We reiterate, however, that the state's attorney's comments about S suffering from delayed disclosure syndrome were not improper. See part I E of this opinion.

[49] During his rebuttal argument, the state's attorney referred to an inconsistency in the defendant's testimony about the last time he had consumed an alcoholic beverage, before remarking: "But you heard him start to backpedal. You know, he was caught in a lie . . . and I'm not saying because he drinks, because he had a pitcher of beer on April 1 or at any other time he necessarily sexually assaulted [S]. *What I'm saying is, he's a liar and anything he says is suspect.* If he's going to lie about that—the drinking thing, the so what thing, what—what else is [he] gonna tell us? Is he gonna tell us that he sexually assaulted that kid? He's not gonna tell us that." (Emphasis added.)

With respect to those comments during the rebuttal argument wherein the state's attorney called the defendant a "liar," the trial court instructed the jury: "Also, the term 'liar' was used during a portion of the state's rebuttal argument. Obviously, the credibility of all the witnesses is in your hands and you should consider all of the testimony and evidence about that in assessing credibility, but the use of the term 'liar' should be avoided in court and you should disregard that term that was addressed in the arguments of the—of the state in his rebuttal."

failed to remove the prejudice to the defendant that stemmed from the state's attorney's misconduct. The state claims in response that the jury is presumed to have followed these instructions, and with no evidence to the contrary, any harm to the defendant therefore was obviated.

"[W]e have previously recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 569, 710 A.2d 1348 (1998); *State* v. *Cruz*, 212 Conn. 351, 365, 562 A.2d 1071 (1989); *State* v. *Ubaldi*, supra, 190 Conn. 563. Moreover, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 258. We note, however, that a general instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the misconduct has been more than an isolated occurrence. See, e.g., *State* v. *Wickes*, 72 Conn. App. 380, 399–400, 805 A.2d 142 (trial court gave general instruction on how to evaluate witness credibility, and that counsel's statements or arguments were not evidence; "prosecutor's single comment about a witness' lack of credibility was not egregious enough such that the court's instruction could not have cured the impropriety," especially in light of strong state case), cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002).

Bearing in mind these standards, we now turn to the misconduct at issue in the present case. The record reveals that the prejudicial effect of the state's attorney's comments on delayed disclosure syndrome, and his having called the defendant a "liar," was mitigated by the specific, direct and immediate instruction by the trial court. Indeed, we note that the defendant did not

object to the content of this curative instruction. See also part I E of this opinion. The record reveals, however, that the other instances of misconduct, namely, the violations of *Singh* and the inflammatory religiously charged arguments, were not addressed specifically by the trial court, either sua sponte or upon objection.

Before addressing the import of the uncured improper arguments, we note that the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that "defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time." *State* v. *Andrews*, 248 Conn. 1, 19–20, 726 A.2d 104 (1999). Moreover, as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems "marginally objectionable" for tactical reasons, namely, "because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument." (Internal quotation marks omitted.) *State* v. *Dillard*, 66 Conn. App. 238, 249, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001). Accordingly, we emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error contemplated by the third prong of *State* v. *Golding*, supra, 213 Conn. 240, namely, that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." Put differently, *Golding* review of prosecutorial misconduct claims is not

intended to provide an avenue for the tactical sand-bagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived a criminal defendant of his right to a fair trial.[50]

We conclude, however, that the prosecutorial misconduct in the present case, namely, the violation of *Singh* and the inflammatory religious argument, was sufficiently egregious to overcome the suggestion that defense counsel did not think it was unfair at the time. Although we deem trial counsel's failure to object to these blatant improprieties inexplicable, we nevertheless conclude that the curative measures were not, by themselves, sufficiently strong to cure the prejudice caused to the defendant by the state's attorney's improprieties. Therefore, we will continue our review of the defendant's claims under the other factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, in order to determine if the prosecutorial misconduct ultimately violated the defendant's right to a fair trial.

4

Whether the Misconduct Was Central to the
Critical Issues in the Case, Particularly
in Comparison to the Strength of the
State's Case against the Defendant

The final two *Williams* factors are the centrality of the prosecutorial misconduct to the critical issues of the case, and the strength of the state's case. Id. We deem it appropriate in the present case to review these factors together. The defendant claims that the state's case was not particularly strong because: (1) there was

[50] Cf. *State* v. *Safford*, 22 Conn. App. 531, 537, 578 A.2d 152 ("[e]xcept in the most extraordinary circumstances, however; see *State* v. *Evans*, [165 Conn. 61, 70, 327 A.2d 576 (1973)]; appellate claims must be the product of trial counsel's efforts, not those of appellate counsel sifting through the record after the fact, trawling for issues undreamt of at trial"), cert. denied, 216 Conn. 823, 581 A.2d 1057 (1990).

no conclusive physical evidence of sexual abuse; and (2) the case rested on S's testimony, which largely consisted of answers to leading questions. The defendant also claims that as a result of the nature of the state's case, the sole issue at trial was the credibility of S and the defendant. The state contends in response that: (1) the lack of physical evidence did not automatically render its case weak; (2) witness credibility is an issue in virtually every case; and (3) the leading questioning aided S in testifying more fully, and that the defendant had the opportunity to attack her testimony on cross-examination. We conclude that these factors weigh firmly in the defendant's favor.

While the state correctly notes that the absence of conclusive physical evidence of sexual abuse does not automatically render its case weak, that same absence surely does not strengthen the state's case against the defendant. In our view, the defendant's assessment of this case as entirely a credibility contest between S and the defendant is correct. Indeed, as we noted in *State* v. *Alexander*, supra, 254 Conn. 308, a child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim, it is "not particularly strong . . . ." (Internal quotation marks omitted.) See also *State* v. *Singh*, supra, 259 Conn. 724 ("the state's evidence, while sufficient to result in a conviction, was not particularly strong"). Also, as in *Singh* and *Alexander*, "all of the improprieties were connected directly to the critical issue, indeed the only disputed issue at trial . . . ." Id.; see also *State* v. *Alexander*, supra, 308 ("improper comments directly addressed the critical issue in this case, the credibility of the victim and the defendant" [internal quotation marks omitted]). In our view, without independent physical evidence to prove that the defendant had sexually assaulted S, or even that S had been sexually

assaulted at all, the significance of the state's attorney's improper conduct increases considerably.

Accordingly, we conclude that, in light of the factors set forth in *State* v. *Williams,* supra, 204 Conn. 540, the state's attorney's misconduct in the present case deprived the defendant of his right to a fair trial because the prosecutorial improprieties, namely, the violations of *Singh,* the "do your part" exhortation, and the inflammatory religious arguments, were pervasive and directed at the critical evidentiary issue, which was the credibility of both S and the defendant. We also note the general lack of curative measures. Indeed, we cannot conclude that, in the absence of other independent evidence to prove that the defendant had sexually assaulted S, the jury would have concluded that the evidence proved the defendant's guilt beyond a reasonable doubt. *State* v. *Singh,* supra, 259 Conn. 725. Accordingly, the defendant was deprived of his right to a fair trial, and we reverse the judgment of conviction and remand the case to the trial court for a new trial.[51]

## II

## WHETHER A SPECIFIC UNANIMITY INSTRUCTION WAS WARRANTED

Although the prosecutorial misconduct issue is dispositive, and we remand this matter for a new trial, we will address two of the defendant's remaining three claims because the issues that they present are likely to arise again on remand.[52] Accordingly, we now turn to the defendant's claim that the trial court improperly failed to instruct the jury that its verdict had to be

[51] Because we reverse the defendant's conviction as a result of his due process claim, we need not reach his request that we exercise our supervisory powers to reverse his conviction. See also footnote 5 of this opinion.

[52] We do not consider it likely that the defendant's evidentiary claim with respect to the admission of constancy of accusation testimony will arise on remand. Accordingly, we will not address this claim.

unanimous as to an underlying act supporting conviction of each of the two counts charged, thereby violating his state and federal constitutional rights to a unanimous verdict and to a fair trial. The state contends in response that the trial court's instruction did not sanction a nonunanimous verdict, and that the defendant is therefore not entitled to have his claim reviewed. *State* v. *Famiglietti*, 219 Conn. 605, 619, 595 A.2d 306 (1991). We conclude that the trial court's instruction to the jury did not improperly sanction a nonunanimous verdict.

The defendant did not preserve this claim at trial and seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40.[53] We will review this claim because an adequate record for review exists, and "[a] claim bearing on the defendant's right to a unanimous verdict implicates a fundamental constitutional right to a fair trial and is thus reviewable despite the defendant's failure to request a specific unanimity charge or to take proper exceptions." *State* v. *Famiglietti*, supra, 219 Conn. 619. We conclude, however, that the defendant failed to satisfy the third and fourth prongs of *Golding* because we conclude that the trial court's instructions to the jury did not sanction a nonunanimous verdict and, therefore, did not violate the defendant's right to a fair trial.

In charging the jury, the trial court first explained in detail the elements of each of the two charges, sexual assault in the first degree and risk of injury to a child. This charge instructed the jury that the state must prove each element of each count beyond a reasonable doubt. After explaining the charges, the trial court then instructed the jury that "[w]hen you reach a verdict, it must be unanimous as to each count charged."

---

[53] See footnote 25 of this opinion.

Subsequently, after one day of deliberations, the jury reached a guilty verdict on the risk of injury charge, but not the sexual assault charge. The jury had indicated that this verdict was unanimous, and the trial court accepted it. The trial court then gave the jury additional time to deliberate on the sexual assault charge. Before the jury returned to deliberations, however, the court had emphasized three times that its verdict on this charge must be unanimous. Subsequently, after an additional day of deliberations, the jury returned a unanimous verdict of guilty on the sexual assault charge.

In *State* v. *Famiglietti*, supra, 219 Conn. 619–20, this court articulated the general principles governing specific unanimity charges. "[W]e have not required a specific unanimity charge to be given in every case in which criminal liability may be premised on the violation of one of several alternative subsections of a statute. We have instead invoked a multipartite test to review a trial court's omission of such an instruction. *We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter.* Even if the instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged." (Emphasis added.) Id.

With respect to the first prong of *Famiglietti*, namely, whether the trial court's jury instructions have sanctioned a nonunanimous verdict, it is well established that "the absence of language *expressly sanctioning* a nonunanimous verdict means that the defendant has not met the first part of the *Famiglietti* test." (Emphasis added.) *State* v. *Reddick*, 224 Conn. 445, 454, 619 A.2d

453 (1993); *State* v. *Dyson*, 238 Conn. 784, 793, 680 A.2d 1306 (1996). Indeed, if "the trial court did not sanction a nonunanimous verdict we need not address the other parts of the *Famiglietti* test." *State* v. *Reddick*, supra, 454.

Our review of the trial court's charges to the jury in the present case reveals a distinct absence of any language that could lead the jury to believe that a non-unanimous verdict was in any way permissible. We, therefore, do not reach the remainder of the *Famiglietti* test. In our view, the trial court took pains to emphasize the requirement that the jury's verdict be unanimous as to each count charged. Indeed, in *State* v. *Senquiz*, 68 Conn. App. 571, 590, 793 A.2d 1095, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002), a case in which the defendant was charged with and convicted of sexual assault in the first degree and risk of injury to a child arising out of multiple occasions, the Appellate Court upheld instructions similar to those given in the present case[54] because, "after explaining the elements of each charge to the jury with reference to the victim's testimony, the court reminded the jury to consider each count separately, to make findings related to each element of each count and to act unanimously on each count." Accordingly, we conclude that the trial court's instructions to the jury in the present case did not violate the defendant's right to a fair trial by sanctioning a nonunanimous verdict.[55]

---

[54] The trial court instructions in *State* v. *Senquiz*, supra, 68 Conn. App. 588, provided as follows: " '[I]f you find that the state has failed to prove, beyond a reasonable doubt, any one of the elements of a crime, you must then find the defendant not guilty of that crime.' The court urged the jury to '[r]emember, there are three counts in this case. . . . You must consider each count separately and render a verdict of guilty or not guilty on that count, depending upon your findings concerning the elements of that count.' Finally, the court stated to the jury that the verdict 'has to be unanimous on each count.' "

[55] The defendant cites a variety of sister state authority in support of his claim that the trial court's charge sanctioned a nonunanimous verdict because the court did not explain expressly that the jurors had to agree on

## III

## WHETHER A CHILD CREDIBILITY INSTRUCTION WAS WARRANTED

The defendant's final claim in this appeal is that the trial court improperly refused to give the child credibility instruction that he had requested. The state claims in response that the trial court properly refused to give the defendant's requested charge because it contravened the rationale and ruling of the controlling case, *State* v. *James*, 211 Conn. 555, 570–71, 560 A.2d 426 (1989). We conclude that the trial court properly refused to give the child credibility instruction requested by the defendant.

We set forth the following additional facts and procedural history necessary for the resolution of this claim. The defendant had requested that the trial court instruct the jury that: "You should bear in mind that in certain aspects a young child is more apt to err than an older person; he or she is apt to be more amenable to any influence or suggestion which may be made to them by older persons, and the sanctity of the oath and solemnity of legal proceedings may affect them less than an adult. These are some factors which you may consider

---

the underlying act when determining if he was guilty of each count charged. See *Woertman* v. *People*, 804 P.2d 188, 191–92 (Colo. 1991); *Commonwealth* v. *Conefrey*, 420 Mass. 508, 514, 650 N.E.2d 1268 (1995); *State* v. *Weaver*, 290 Mont. 58, 70, 964 P.2d 713 (1998); *State* v. *Saunders*, 992 P.2d 951, 968 (Utah 1999); *State* v. *Kitchen*, 46 Wash. App. 232, 235–36, 730 P.2d 103 (1986), aff'd, 110 Wash. 2d 403, 406, 756 P.2d 105 (1988). We reject the defendant's contention because it is incompatible with the review process that we undertake pursuant to *State* v. *Famiglietti*, supra, 219 Conn. 619–20, and *State* v. *Reddick*, supra, 224 Conn. 454. Under these well established precedents, we first must find language in the charge "expressly sanctioning a nonunanimous verdict . . . ." *State* v. *Reddick*, supra, 454; *State* v. *Famiglietti*, supra, 619–20. The defendant failed to cite, and our independent review fails to reveal, any express language in the trial court's charge that sanctioned a nonunanimous verdict. Accordingly, our inquiry ends at that point, and we reject his contention.

when assessing the credibility of the children who testified in this case." Although the trial court refused to give the special child credibility instruction, it did charge the jury in accordance with the first part of the defendant's request to charge. The court instructed the jury only that it was solely responsible for assessing the credibility of S, and that it could consider her age, demeanor, capacity to understand and answer questions intelligently, and ability to observe and recollect facts.[56] The defendant took an exception to the trial court's refusal to give the requested instruction.

We begin our analysis by noting the applicable standard of review. We review a trial court's refusal to give a child credibility instruction for abuse of discretion because that instruction is "not for the statement of any rule of law but for a cautionary comment upon the evidence." *State* v. *James*, supra, 211 Conn. 571; *State* v. *Angell*, 237 Conn. 321, 330, 677 A.2d 912 (1996).

In *State* v. *James*, supra, 211 Conn. 570, this court overruled its earlier decision in *State* v. *Anderson*, 152 Conn. 196, 198, 205 A.2d 488 (1964), and concluded that it is *not* "essential to grant a requested charge that denigrates a child as usually less worthy of belief than an adult, especially when it treats all children uniformly regardless of differences in age or intelligence and also omits any reference to factors commonly recognized as enhancing the credibility of a child." In so concluding, this court considered the great weight of authority from both the courts of our sister states, and the scientific

---

[56] Specifically, the trial court had instructed the jury: "As with all other witnesses you are the sole judge of assessing the credibility of a child witness who testifies at trial. You may consider not only the age of the child, but also the demeanor while testifying, the capacity to observe facts and to recollect them, the ability to understand questions put to him or her, and the ability to answer them intelligently. In this regard there was evidence that [S] is now eight years old, and was seven years old at the time she alleges the events . . . took place."

community, and noted that "[a]uthorities, more qualified than judges in regard to child behavior, question the conventional wisdom that children are less likely to be truthful on the witness stand than adults and, at least with regard to children as old as [the twelve year old complainants], that they are less capable of distinguishing the real from the imaginary." *State* v. *James*, supra, 568. This court concluded that the child credibility instruction is "not for the statement of any rule of law but . . . a cautionary comment upon the evidence," which lies in the "broad discretion of [the] trial court . . . ." Id., 571.

A court considering whether to give a special child credibility instruction considers factors that include, but are not necessarily limited to, the child's age, corroboration of the accusations, the child's ability to recall and discuss events in the past, and the child's understanding of the concept of truthfulness. See, e.g., *State* v. *Angell*, supra, 237 Conn. 331 n.11 (where victim was nine years old when incident occurred and thirteen years old when she testified at trial, instruction remains in discretion of trial court even when only corroboration evidence is constancy of accusation); *State* v. *Nguyen*, 52 Conn. App. 85, 96, 726 A.2d 119 (1999) ("During questioning by the court, [eight year old complainant, who was five years old when incident occurred] demonstrated an understanding of the importance of being truthful and an ability to recall events several years in the past. On direct examination, she was cogent and coherent. We find nothing to suggest that the trial court's refusal to charge on child credibility was unreasonable."), aff'd, 253 Conn. 639, 756 A.2d 833 (2000).

Under the facts of the present case, we conclude that the trial court did not abuse its discretion when it refused to give the requested child credibility instruction. S was seven years old at the time of the allegation and eight years old when she testified at trial. We note

that it was established during preliminary questioning prior to her direct examination that S understood the concept of truthfulness. See footnote 40 of this opinion. Moreover, the lack of corroboration, beyond constancy of accusation evidence, is not dispositive. *State* v. *Angell,* supra, 237 Conn. 331 n.11. We also note that the trial court gave the jury the general credibility instruction, which also had been requested by the defendant. See footnote 56 of this opinion. Accordingly, we conclude that the trial court did not abuse its discretion by refusing to give the child credibility instruction.[57]

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion BORDEN, PALMER and PELLEGRINO, Js., concurred.

ZARELLA, J., concurring in part and dissenting in part. I concur in parts II and III of the majority opinion, in which the majority addresses the propriety of the trial court's failure to issue a unanimity instruction and its refusal to instruct the jury on the credibility of S, the child victim who testified at trial, as the defendant requested. I respectfully dissent from part I of the majority opinion, however, because I do not believe that the state's attorney made religiously charged statements during closing arguments, that he improperly suggested that the jurors had a duty to convict the defendant, or that the cumulative effect of the alleged improprieties deprived the defendant of his due process right to a

---

[57] We reject the defendant's contention that the instruction was warranted because S was not cogent and coherent on direct examination, and that her testimony was "marred by ambivalence and leading questions . . . ." Our review of the record indicates that the defendant did not object to most of the leading questions. Moreover, we note from our review of the record, that S answered questions responsively and appropriately on both direct examination and cross-examination.

fair trial. Accordingly, I do not agree that reversal is warranted in the present case.

I

The state's attorney argued during summation: "I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday." The majority concludes that this argument was especially damaging in light of the state's attorney's earlier remark during summation that the defendant wanted the jury "to believe that pure evil, Satan's daughter, appeared here on Friday morning in this courtroom . . . ." I disagree.

It is well established that, "[w]hen making closing arguments to the jury . . . [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 162, 836 A.2d 224 (2003).

A reviewing court also should be mindful that the trial court views the proceedings in totality and, therefore, is in the unique position of observing the demeanor and conduct of the participants in a manner that is not fully reflected in the "cold, printed record . . . ." *Tulisano* v. *Schonberger*, 74 Conn. App. 101, 105, 810 A.2d 806

(2002). Indeed, this court often has recognized "the power [and] the duty of the trial court to comment upon the propriety of counsel's argument . . . to give curative instructions if necessary after the arguments of counsel to prevent prejudice . . . or to declare a mistrial or to set aside a verdict if counsel's comments were so prejudicial that no curative instruction could preserve the parties' right to a fair trial." (Internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492, 520, 811 A.2d 667 (2002). Consequently, I would give significant weight to the trial court's response, or lack thereof, to the allegedly prejudicial remarks.

In the absence of a per se misconduct rule, which the majority expressly rejects, not all religious references, including allusions to the Bible, God or other biblical characters, are impermissible. This is because many words and phrases traditionally viewed as religious in nature or derived from religious sources have become, over time, an integral part of the English language, and no longer may be recognized by either prosecutors or jurors as having purely religious connotations or derivations. Consider, for example, the phrases "raising Cain"[1] and "for whatever a man sows, that he will also reap."[2] Both phrases are common expressions derived from the Bible. Still other expressions, such as "an eye for an eye," have both religious[3] and secular[4] origins. This court never has adopted a per se misconduct rule—

[1] Genesis 4:8.

[2] Galatians 6:7.

[3] Exodus 21:24.

[4] The Code of Hammurabi ¶196, reprinted in C. Johns, Babylonian and Assyrian Laws, Contracts and Letters (1904) p. 62 ("[i]f a man has knocked out the eye of a patrician, his eye shall be knocked out"). "The frieze contained on the south wall of the courtroom of the United States Supreme Court includes a procession of great lawgivers of history, including Hammurabi, the Babylonian king who developed the Code of Hammurabi . . . ." *Books* v. *Elkhart*, 235 F.3d 292, 315 n.2 (7th Cir. 2000) (Manion, J., concurring in part and dissenting in part), cert. denied, 532 U.S. 1058, 121 S. Ct. 2209, 149 L. Ed. 2d 1036 (2001).

and declines to do so in the present case—because it recognizes that a prosecutor's religious references will not always rise to the level of misconduct.

In the present case, the state's attorney argued during summation that the defendant wanted the jury "to believe that pure evil, Satan's daughter, appeared here on Friday morning in this courtroom . . . ." Webster's Third New International Dictionary provides three definitions for "satan": (1) "devil"; (2) "a minion of the archfiend"; and (3) "a wicked person: fiend . . . ." The explanatory notes contained in Webster's Third New International Dictionary provide that the order of the definitions is historical, and, thus, regular reference to satan as the "devil" is deemed to have occurred the earliest in time of the three definitions provided. The entry for "satan" also provides that the definition, "minion of the archfiend," is an obsolete definition, there being little or no evidence of its standard usage since 1755. The word "satan," therefore, no longer can be construed as having purely religious connotations.

Moreover, even if certain words have religious implications or derivations, the majority misses the point. As in all languages, it is *how* the word is used that is important. In the present case, it is clear from the context of the statement that the state's attorney's reference to satan was intended to convey that the defendant wanted the jury to believe that S was a bad person, not that she was the devil or a minion of the archfiend. Similarly, when the state's attorney referred to S's acknowledgment during cross-examination that God would punish her if she told a lie and then stated that "the defendant is not concerned about what God is going to do to him," he was not suggesting that the defendant is or is not a God-fearing person, but, rather, that the defendant had a more immediate problem.[5] To

---

[5] See footnote 30 of the majority opinion.

conclude, as does the majority, that such a statement invokes "notions of divine punishment for worldly transgressions" defies common sense. I therefore disagree that the state's attorney made a religiously charged argument when he stated that the defendant wanted the jury to believe that S was "pure evil, Satan's daughter," and that the defendant was "not concerned about what God is going to do to him . . . . He's worried about what you people are going to do . . . ."

The majority insists that such references are fraught with religious implications, despite their common usage, but I would submit that not all religious references or arguments have a harmful effect when considered in context. In *Sandoval* v. *Calderon*, 241 F.3d 765 (9th Cir.), cert. denied, 534 U.S. 847, 122 S. Ct. 112, 151 L. Ed. 2d 69 (2001), and cert. denied, 534 U.S. 943, 122 S. Ct. 322, 151 L. Ed. 2d 241 (2001), a habeas action, the Ninth Circuit Court of Appeals examined references to religion during closing arguments at the petitioner's underlying trial. In *Sandoval*, defense counsel stated the following during closing arguments: "[I]n . . . thinking about how hard your job is, how difficult your job is, in reality you could sit, play God to an individual. . . . [The petitioner] has a chance for doing some good. Anything that you do. I don't think society requires revenge. I don't think that you require revenge. An eye for an eye." (Internal quotation marks omitted.) Id., 777 n.2.

The court noted that defense counsel's use of the phrase, " 'play[ing] God,' " and his reference to "an eye for an eye" had occurred "in the context of a secular argument against vengeance. Defense counsel did not invoke religious authority to support the result he advocated." Id., 777. Thus, the court determined that defense counsel's reference to "[a]n eye for an eye" was permissible in the context in which the reference was made. Id.

The court in *Sandoval* viewed the prosecutor's remarks in a different light, however. In *Sandoval*, the prosecutor, in responding to defense counsel's argument, argued to the jury in relevant part: "[Defense counsel] says don't play God. Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil." (Internal quotation marks omitted.) Id., 775 n.1. The court concluded that, although defense counsel's reference to " 'play[ing] God' " was not improper, the prosecutor's use of the same phrase in the course of a fully developed argument with a clear religious message "was not merely fair response to comments in defense counsel's closing argument." Id., 777. In the present case, by contrast, the state's attorney did not make his religious references amid a fully developed argument imbued with strong religious implications.

The majority cites cases, almost all involving the imposition of the death penalty, in which courts in other jurisdictions have determined that the prosecutor made improper religious references. See part I B of the majority opinion. In each of those cases, however, the references were more numerous, developed or specific than the references in the present case. See, e.g., *Sandoval* v. *Calderon*, supra, 241 F.3d 775 (prosecutor "paraphrased Romans 13:1-5, a passage from the Bible's New Testament commonly understood as providing justification

for the imposition of the death penalty"); *Bennett* v. *Angelone*, 92 F.3d 1336, 1346 (4th Cir.) (prosecutor referred to Noah's sword of justice, Jesus and Romans), cert. denied, 519 U.S. 1002, 117 S. Ct. 503, 136 L. Ed. 2d 395 (1996); *Cunningham* v. *Zant*, 928 F.2d 1006, 1020 and n.24 (11th Cir. 1991) (prosecutor drew comparisons between defendant and Judas Iscariot); *United States* v. *Giry*, 818 F.2d 120, 132–34 (1st Cir.) (prosecutor compared defendant's denial of intent to import cocaine to Peter's denial of Christ), cert. denied, 484 U.S. 855, 108 S. Ct. 162, 98 L. Ed. 2d 116 (1987); *Long* v. *State*, 883 P.2d 167, 177 (Okla. Crim. App. 1994) (prosecutor included lengthy and colorful biblical quotation in penalty phase argument), cert. denied, 514 U.S. 1068, 115 S. Ct. 1702, 131 L. Ed. 2d 564 (1995); *State* v. *Cribbs*, 967 S.W.2d 773, 783–84 (Tenn.) (prosecutor referred to biblical passages and religious law), cert. denied, 525 U.S. 932, 119 S. Ct. 343, 142 L. Ed. 2d 283 (1998). I do not agree with the majority's suggestion that the references made by the state's attorney in the present case were similar in frequency, degree or specificity to those that were determined to be improper in the foregoing cases.

The majority acknowledges that both the trial court and defense counsel took no action at trial in response to the state's attorney's purportedly inflammatory remarks. The majority also observes that a defendant has the responsibility to object to perceived prosecutorial improprieties when they occur, that defense counsel's failure to object to the state's attorney's remarks in the present case was "inexplicable," and that the inaction on the part of defense counsel suggests that he did not believe that the remarks were unfair or prejudicial when they were made. Part I G 3 of the majority opinion. I agree with those observations and, therefore, do not understand how the majority can conclude that the state's attorney's remarks were "sufficiently egre-

gious to overcome the suggestion that defense counsel did not think it was unfair at the time." In my view, the failure of the court and defense counsel to raise any objection indicates exactly the opposite, namely, that the overall tone and inflection of the words when they were spoken, and their effect on the jurors, could not have been so inflammatory as to raise any eyebrows or to warrant a response.

I believe that the invocation of a higher law urging the application of principles of various religious beliefs, in lieu of or in addition to our statutory and common law, as well as extensive quotations from religious sources, is almost always improper. I also believe that prosecutors should refrain from making any reference to religion unless it relates to a substantial issue in the case. Nevertheless, when a prosecutor makes reference to terms or phrases that originated in religious texts, but that, over time, have assumed a secular connotation, the court should conduct an analysis of the context, imagery and purpose of those terms or phrases. Reference to such terms or phrases can in certain instances be innocuous while in other instances rise to the level of misconduct. I conclude that the references in the present case were not improper, especially in view of the fact that the trial court failed to comment, and defense counsel failed to object, when the references were made.

## II

I also disagree with the majority's conclusion that the state's attorney's comment to the jury that S "did her part" and that "it's now time for you to do your part" was inappropriate under *State* v. *Whipper*, 258 Conn. 229, 780 A.2d 53 (2001). See part I C of the majority opinion. In *Whipper*, the state's attorney argued to the jury: "Now you're here as members of the community. You represent what your community is going to

be. Not me. I did my part. The police did their job
. . . ." (Internal quotation marks omitted.) *State* v.
*Whipper*, supra, 271 n.19. In *Whipper*, this court deter-
mined that the argument of the state's attorney sug-
gested to jurors that they had a duty, as members of
the community, to find the defendant guilty. Id., 271.
The present case, however, is distinguishable. Unlike
in *Whipper*, the state's attorney in the present case did
not suggest that the jurors' failure to find the defendant
guilty might taint the community, but, rather, that the
jurors had a duty to decide the case, just as S had a
duty to testify at trial. Moreover, defense counsel in
*Whipper* immediately objected to the state's attorney's
comment whereas defense counsel in the present case
did not. At best, the comment in the present case is a
borderline example of prosecutorial misconduct. Nev-
ertheless, such a comment does not provide a basis
for reversal.

## III

Finally, I do not believe that the cumulative effect of
the alleged prosecutorial misconduct in the present
case deprived the defendant of his right to a fair trial.
The majority concludes that the state's attorney's (1)
inflammatory references to religion during closing argu-
ments, (2) improper cross-examination of the defendant
about the veracity of S and subsequent references to
that improper cross-examination during closing argu-
ments, and (3) request during summation that the mem-
bers of the jury "do [their] part,"[6] constituted a pattern
of misconduct that compromised the fundamental fair-
ness of the trial. I conclude, to the contrary, that the
religious references were made in a secular context

---

[6] The majority includes this comment in its analysis of prosecutorial mis-
conduct under *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), only
with respect to whether it was invited by defense counsel, but nonetheless
concludes that it was a significant factor in depriving the defendant of his
right to a fair trial. See part I G of the majority opinion.

and, therefore, do not rise to the level of impermissible conduct. I also conclude that the cumulative effect of the other alleged improprieties, one of which I deem to be only borderline misconduct, if at all, does not require reversal pursuant to *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).[7]

The standard for reversal of a judgment on the basis of prosecutorial misconduct requires the defendant to "establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 700, 793 A.2d 226 (2002). "[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole." Id., 701. In the present case, the state's attorney's cross-examination of the defendant and the state's attorney's subsequent reference to that testimony during rebuttal does not satisfy the required standard.

I agree with the majority that the state's attorney's attempt during cross-examination to question the defendant regarding S's veracity was not invited by defense counsel and that the state's attorney improperly referred to that questionable cross-examination testimony in his rebuttal argument when attacking the defendant's credibility. I would not characterize those violations as "frequent," however. The misconduct that had occurred during cross-examination of the defendant was limited to a single episode, as was the state's

---

[7] "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court . . . has focused on several factors. Among them are [1] the extent to which the misconduct was invited by defense conduct or argument . . . [2] the severity of the misconduct . . . [3] the frequency of the misconduct . . . [4] the centrality of the misconduct to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

attorney's reference to the defendant's cross-examination testimony during closing arguments. Regardless of whether those two events are considered related improprieties or separate occurrences, they reasonably cannot be deemed to be *frequent*. Nevertheless, such conduct is impermissible, and, accordingly, I would agree with the majority that the conduct of the state's attorney in that regard was improper.

The majority next concludes that the trial court's curative instructions mitigated the prejudice stemming from the state's attorney's accusation that the defendant was a "liar," but did not mitigate the prejudice stemming from his remarks concerning the defendant's cross-examination testimony regarding S's veracity or the improper cross-examination itself. The majority accordingly concludes that the trial court's instructions were insufficient to cure the resulting prejudice stemming from the latter conduct. I disagree because I believe that the majority misconstrues the state's attorney's argument and the court's curative instructions.

A careful review of the transcript shows that the last portion of the state's attorney's rebuttal argument was directed to the respective credibility of the defendant and S.[8] During his argument, the state's attorney dis-

---

[8] The state's attorney argued: "And the defendant, he got up there. I didn't do it. Now, ladies and gentlemen, I submit you just can't think that this didn't happen because he happened to get up there and say, I didn't do it. I hope you weren't expecting a courtroom confession. It makes good TV. It doesn't happen in real life. He denied it. Did he have another option? You know, you have to examine what he said very carefully. . . . [Defense counsel] says he came here, he got a job, he came to get educated. That doesn't mean he's not a pedophile, does it?

"You know, remember that drinking issue that came up? [One of the detectives] mentioned during his testimony that when he arrested the defendant, the defendant appeared to him to have been drinking. He might have been drunk. Okay. No big deal. What does that prove? Does that prove [S] was a liar? Does it prove that she was telling the truth? I don't know. It's just something [the] [d]etective . . . observed. But, you know, it turned out it didn't have anything to—bearing to do on [S's] testimony, but it did have some bearing on . . . his testimony, on his credibility, didn't it? You

## cussed: (1) the defendant's testimony regarding the last

know, the defendant then puts on his witnesses . . . and they bring up this whole drinking thing. Well, he wasn't allowed to drink up there, he wasn't allowed to keep alcohol there, he didn't drink, this, that and the other thing. It's like, you know, who cares? And then he gets up there, and I ask him, you know, so you weren't drinking that night. When was the last time you had a drink? Three months. Three months before I got arrested. Three months. I didn't ask him once. I said, three months? You're sure? I didn't ask him that once. It wasn't three months, no. You know, it was April [1] when he admitted to somebody that he drank a pitcher of beer and he was drunk. Okay? It's not three months. . . . But you heard him start to back-pedal. You know, *he was caught in a lie. He knew he was caught in a lie,* and I'm not saying because he drinks, because he had a pitcher of beer on April [1] or at any other time he necessarily sexually assaulted [S]. What I'm saying is, *he's a liar* and anything he says is suspect. *If he's going to lie about that*—the drinking thing, the so what thing, what—what else is [he] go[ing] [to] tell us. Is he go[ing] [to] tell us that he sexually assaulted that kid? He's not go[ing] [to] tell us that.

"You know, how about the description of what happened, the events of May [10] of 2000 when [S's mother] comes, he's supposedly—he says he fell asleep watching TV. When [S's mother] comes banging on that door, hey, my kid just told me that you sexually assaulted her, and a few epithets in there too, yelling, screaming. Can you blame her? Now, according to the defendant, he told [S's mother], well, go get the child checked out by the doctor. Go get the child checked out by the doctor? You've just been accused of sexually abusing a seven year old female. Go get the child checked out by a doctor, and then what do you do? Go back to sleep? That's what he said. After the banging, after the confrontation, what did you do? I went back to sleep. Then we hear that the cousin—cousin's husband comes banging on the door. What are you go[ing] [to] do? What are you go[ing] [to] do about this? I'm go[ing] [to] go back to sleeping. Is that, ladies and gentlemen, the reaction of a normal person falsely accused of this kind of horrific crime? No. That's the reaction . . . of someone who is in serious denial, who can't admit to anyone, their family, including themselves, you, ladies and gentlemen, that I did. No. I'm go[ing] [to] ignore this. It's going to go away. Everything will all be better tomorrow.

"Now, I also asked the defendant why would [S] come in here and say that you kissed her if it wasn't true. I don't know. I have no idea. Why would [S] say you touched her chest, put your finger in her vagina, put your finger in her rectum, touched her privates . . . with your privates, put her hand on your privates? I don't know. I don't know. I don't know. Has no idea. . . . Doesn't it take you back here and you just want to scratch your head, because I gave him every reason in the book. I said, there must've been a time when you were mean to the kid, mean to mom. Did you hit the kid? Did you deprive the kid of something? [Did you not] give her some food? . . . Did you hit the mom? [Were you] mean to the brothers? You know,

time he had consumed an alcoholic beverage; (2) the defendant's testimony that he had gone back to sleep after S's mother and her cousin's husband confronted the defendant and accused him of sexually assaulting S; (3) S's accusation that the defendant had assaulted her, remarks that were based on the state's attorney's improper cross-examination of the defendant; and (4) the respective motives of the defendant and S to lie about the events that had transpired. All four points were made in support of a single contention, namely,

he couldn't give us a reason. *He couldn't give us a reason why that kid would lie, and why is that? Because there isn't one*; that's why. You know, I guess *he wants you to believe* that pure evil, Satan's daughter, appeared here on Friday morning in this courtroom; that *the child* just one . . . day *decided to tell* her mother, some police officers, some doctors and eight strangers in a courtroom *one big fat lie*, and for what? What has that kid gained? The acceptance of her mother? She told her mother what she wanted to hear, or maybe [the defendant] wasn't listening to her, to [S], on Friday. He didn't take a lesson from [S]. *I asked [S]* . . . *what happens when you tell a lie*? I just didn't ask her about, you know, [what] the color of my suit was or the shirt or whatever it was. *I asked what happens when you tell a lie*. The clerk just told you something. Now, *what's going to happen if you tell a lie*? God punishes you. Well, I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday. I rarely saw the kid, only at Christmas parties. Ask yourselves, before you come out of that deliberating room, who's got the greatest interest in this case to deceive you? Who's got a motive not to tell the truth here? I submit *it's the defendant who's got the greatest interest here to lie to you.*

"[The court] will tell you that you can take into consideration the defendant's interest in this case when you're thinking about his credibility. On the other hand, *if [S] has fabricated this, lied, manipulated you*, before you come out of that deliberating room, you've got to ask yourselves what, for what? What has she gotten out of this? The opportunity to come in here and be vilified? The opportunity to tell you what happened to the intimate parts of her body? Some opportunity, huh? The opportunity to be examined by some doctors? The opportunity to meet with [police detectives] until late at night telling [them] what happened? That's an opportunity I'd really like to live through. What is that kid getting out of it? If you ask yourselves that question . . . before returning that verdict, I'm sure you're go[ing] [to] be returning a verdict that is consistent with the information that's been filed in this case, guilty on sexual assault in the first degree, guilty on risk of injury to a [child]. Thank you. Thank you, Your Honor." (Emphasis added.)

that the credibility of the defendant was weaker than that of S. During the state's attorney's rebuttal argument, the word "lie," or a derivation thereof, was used eleven times in describing the defendant or S, but only to suggest that the defendant's testimony was untruthful because S had no motive to lie.

Following closing arguments, defense counsel raised an objection with respect to the rebuttal argument of the state's attorney. Defense counsel stated: "[O]n several occasions, [the state's attorney] called [the defendant] a liar. He lied to you, he's a liar, and . . . I don't think that that's proper argument, and I think there are cases that have indicated . . . that it's not proper to refer to a witness as a liar. So, I take exception to that. I ask the court to give some instruction along the lines, either an admonition or some comment to the jury, that that's not proper comment."

In response to counsel's objection, the court, prior to delivering its general instructions to the jury, instructed the jury: "[T]he term 'liar' was used during a portion of the state's [attorney's] rebuttal argument. Obviously, the credibility of all the witnesses is in your hands and you should consider all of the testimony and evidence about that in assessing credibility, but the use of the term 'liar' should be avoided in court and you should disregard that term that was addressed in the arguments . . . of the [state's attorney] in his rebuttal." Defense counsel raised no objection to the special instruction.

In its general instructions to the jury, the court advised the jurors of their duty to assess the credibility of the witnesses. Thereafter, the court delivered a more detailed instruction in which it advised the jurors at least five different times of their duty to determine the credibility of the witnesses, the factors to be considered in determining whether a witness has testified truthfully

and the importance of bringing the jurors' own personal experience to bear on such a determination.[9]

I therefore submit that, although the state's attorney used the word "liar" only in connection with the defendant's testimony regarding drinking, the effect of the

[9] The court instructed the jury in relevant part: "I want to discuss this subject of credibility, by which I mean believability of testimony. You have observed the witnesses. *The credibility, the believability of the witnesses and the weight to be given their testimony are matters entirely within your hands. It is for you alone to determine their credibility.* Whether or not you find a fact proven is not to be determined by the number of witnesses testifying for or against it. It is the quality and not the quantity of testimony which should be controlling. Nor is it necessarily so that because a witness testifies to a fact and no one contradicts it, you are bound to accept that fact as true.

"The credibility of the witness and the truth of the fact *is for you to determine.* In weighing the testimony of witnesses, you should consider the probability or improbability of their testimony. You should consider their appearance, conduct and demeanor while testifying and in court, and any interest, bias, prejudice, sympathy, which a witness may apparently have for or against the state or the accused, or in the outcome of the trial. With each witness you should consider his or her ability to observe facts correctly, recall them and relate them to you truly and accurately. You should consider whether and to what extent witnesses needed their memories refreshed while testifying. You should, in short, size up the witnesses and *make your own judgment* as to their credibility, and decide what portion, all, some, or none of any particular witness' testimony you will believe based on these principles.

"You should harmonize the evidence as far as it can reasonably be done. You should use all your experience, your knowledge of human nature, and the motives that influence and control human conduct, and you should test the evidence against that knowledge. In short, you should bring to bear upon the testimony of the witnesses the same considerations, and use the same sound judgment, you apply to questions of truth and veracity as they present themselves to you in every day life.

"*You are entitled to accept any testimony which you believe to be true and to reject either wholly or in part the testimony of any witness you believe has testified untruthfully or erroneously.* The credit that you will give the—the testimony offered is, as I've told you, something which you alone must determine. Where a witness testifies inaccurately and you either do or do not think that that inaccuracy was consciously dishonest, you should keep that in mind and scrutinize the whole testimony of that witness. The significance you attach to it may vary more or less with the particular fact as to which the inaccuracy existed or with the surrounding circumstances. You should bear in mind that people sometimes forget things. On the other hand, if a witness has intentionally testified falsely, you may disregard the witness' entire testimony, but you are not required to do so.

trial court's curative instruction was to mitigate the prejudice stemming from the multiple references to lying that were made in his *single* argument regarding the relative credibility of the defendant and S. The majority's conclusion that the instruction mitigated the prejudicial effect of only one portion of the state's attorney's argument parses the instruction to such an extent that the forest cannot be seen for the trees. I also would submit that, to the extent that any doubt remains, the combination of the trial court's special instruction and the detailed and extensive instructions on witness credibility in general was more than sufficient to mitigate the prejudicial effect of the references of the state's attorney to lying in his rebuttal argument.

I also believe that the curative effect of the instruction extended to the improper cross-examination inasmuch as the state's attorney included in his rebuttal argument a nearly verbatim account of the disputed portion of the proceedings. See footnotes 26 and 27 of the majority opinion. Accordingly, the trial court's curative instructions regarding credibility mitigated or, perhaps, eliminated any prejudice to the defendant arising from the conduct of the state's attorney, especially in light of defense counsel's failure to object.

With respect to the comment of the state's attorney regarding the duty of the jury, the court specifically instructed the jury that the state had the burden of proving the defendant's guilt beyond a reasonable doubt, that the evidence is limited to the testimony of the witnesses and the exhibits, and that arguments of

---

It is up to you to accept or reject all or any part of any witness' testimony. If you find that a witness has been inaccurate in one respect, remember it in judging the rest of his or her testimony. Give to it that weight which your own mind leads you to think it ought to have and what you—what you would attach to it in the ordinary affairs of life where someone came to you in a matter and you found that in some particular he or she was inaccurate." (Emphasis added.)

counsel are not evidence. In my view, those instructions were sufficient to cure any prejudice that may have resulted from such borderline misconduct. It therefore is unnecessary to consider the final two *Williams* factors, the centrality of the misconduct to the critical issues of the case, and the strength of the state's case.

Because I believe that the trial as a whole was not fundamentally unfair, I conclude that reversal is unwarranted. Accordingly, I respectfully dissent from part I of the majority opinion.